UNITED STATES, Appellee

v.

Richard C. BRESNAHAN, Specialist
U.S. Army, Appellant

No. 04-0559

Crim. App. No. 20010304

United States Court of Appeals for the Armed Forces

Argued May 4, 2005

Decided September 30, 2005


GIERKE, C.J., delivered the opinion of the Court, in which
CRAWFORD and BAKER, JJ., joined.  ERDMANN, J., filed a
dissenting opinion in which EFFRON, J., joined.



Counsel

For Appellant:  Captain Charles L. Pritchard Jr. (argued);
Colonel Mark Cremin and Lieutenant Colonel Mark Tellitocci (on
brief); Major Allyson G. Lambert and Captain Terri J. Erisman.

For Appellee:  Major William J. Nelson (argued); Colonel Steven
T. Salata and Lieutenant Colonel Mark L. Johnson (on brief);
Captain Edward E. Wiggers.

Military Judge:  Gary V. Casida




**This opinion is subject to revision before final publication.**

United States v. Bresnahan, No. 04-0559/AR

Chief Judge GIERKE delivered the opinion of the Court.

INTRODUCTION

This tragedy began on the morning that a three-month-old baby, Austin, was shaken so severely that the injuries he sustained led to his death. The tragedy continued during the early morning hours after Austin died. His family was further torn apart by his father's confession, during questioning by a civilian police detective, that he may have shaken his baby to try to stop his crying.[1] We granted review to determine whether the admission of Appellant's confession at trial was a violation of his due process rights.[2]

At trial, the defense counsel requested expert assistance to determine if Appellant's confession was unreliable because of the detective's interview techniques. The military judge denied the request and we granted review to determine if that ruling

---

[1] Based on this confession and other evidence, Appellant was convicted of involuntary manslaughter, in violation of Article 119, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 919 (2000). He was sentenced to a dishonorable discharge, confinement for six years, forfeiture of all pay and allowances, and a reduction to pay grade E-1.

[2] More specifically, we granted review to determine:

Whether Appellant's right to due process was violated when the military judge failed to suppress Appellant's statements to Detective M-M where such statements may have been in violation of Article 31(d) and the Fifth Amendment prohibition against compulsory self-incrimination.

United States v. Bresnahan, 61 M.J. 12 (C.A.A.F. 2005)(order granting review).

was erroneous.[3]  Also, at trial, the military judge admitted
evidence of prior injuries Austin sustained before his death.
The United States Army Court of Criminal Appeals concluded the
military judge erred in admitting the uncharged misconduct
evidence, but that the error was harmless.[4]  We granted review to
analyze the Army Court's holding.[5]  Finally, the military judge
allowed the trial counsel to cross-examine a defense witness
about two scientific studies that concluded male caregivers are
more likely the perpetrators in shaken baby cases.  Appellant
challenges the conclusions of those studies as inadmissible
"profile" evidence, and we granted review.[6]

    We hold that the military judge committed no error when he
admitted Appellant's confession.  Under the totality of the
circumstances, Appellant's confession was voluntary.  We also

---

[3] The specific issue we granted was:

> Whether the military judge erred to the substantial
> prejudice of Appellant by denying the defense request for
> expert assistance.

Id. at 12.

[4] See United States v. Bresnahan, No. ARMY 20010304, slip op. at
2 (A. Ct. Crim. App. June 4, 2004) (unpublished).

[5] More specifically, we granted review to determine:

> Whether the Army Court of Criminal Appeals erred in finding
> that the military judge's erroneous admission of alleged
> prior uncharged misconduct did not substantially influence
> the findings of the court-martial.

Bresnahan, 61 M.J. at 12.

[6] The final issue was personally asserted by Appellant:

> Whether the military judge committed plain error by
> allowing the Government to introduce inadmissible profile
> evidence.

United States v. Bresnahan, No. 04-0559/AR

conclude that the military judge did not abuse his discretion in denying the defense request for expert assistance because the defense counsel failed to demonstrate necessity for that expert's assistance.  Furthermore, we agree with the lower court that the military judge's error in admitting the uncharged misconduct evidence was harmless.  Finally, the military judge did not err in admitting the "profile" evidence because the defense counsel opened the door to this type of rebuttal.  Thus, we affirm the decision of the Army Court of Criminal Appeals.

BACKGROUND

The fateful morning

On the morning of November 6, 2000, Appellant and his wife, Kristen, were awakened by the sound of their baby crying. Kristen got Austin from his crib and brought him back to their bedroom to feed him.  After Kristen finished feeding him, Appellant returned Austin to his crib, laid him on his stomach, and began patting his back.  At this point, Appellant noticed that the baby was not breathing.  He told his wife to call 911 and he administered CPR until the paramedics arrived.

Austin was rushed to the hospital, where Dr. Mark Storm, an emergency room doctor, tried to resuscitate the baby.  Dr. Storm did not see any outward signs of trauma, but because he could not get any responses from the baby, he thought Austin might

_____

Id.

4

have been in a coma.  Dr. Storm ordered a Computed Tomography
(CT) scan on the baby.  The CT scan revealed that the baby's
brain had shifted, several ventricles had collapsed, and his
brain was bleeding.  Dr. Storm believed the injury was caused by
someone having shaken Austin.

Detective Malek-Madani arrives at the hospital

Detective Leslie Malek-Madani and another Colorado Springs
Police Department officer met with Appellant and his wife in a
quiet room outside the intensive care unit.  Appellant and
Kristen were questioned separately and both cooperated with the
inquiry.  The police officers did not give them Miranda[7] rights
warnings at that time.

During Detective Malek-Madani's interview with Appellant,
she told Appellant that Austin's brain injuries were so severe
that he might not survive.  She then asked Appellant if anything
else happened that morning that might explain Austin's injuries.
Appellant responded two or three times that nothing happened to
Austin except what he already told the detective -- that he laid
Austin down and the baby began choking on his formula.

Detective Malek-Madani responded that Appellant's
recollection of the events of the morning were "impossible" and
pressed for further information.  Detective Malek-Madani then
asked Appellant explicitly if Austin had ever been shaken.

---

[7] Miranda v. Arizona, 384 U.S. 436 (1966).

Appellant initially stated that he had not.  But Appellant then said that in attempting to soothe the baby to make him stop crying, he started to "bounce him up and down" and that it was "possible that Austin's head had bobbed a few times while he was trying to calm him down."

After this admission, Detective Malek-Madani pressed Appellant further.  She told him that to help Austin, the doctors needed to know what had happened.  Appellant eventually stated that he "may have shaken Austin a couple of times."

The interview continues at the police station

Detective Malek-Madani asked Appellant to accompany her to the police station for further questioning.  Appellant agreed. Shortly after arriving at the police station, another police officer contacted Detective Malek-Madani and told her that Sergeant (Sgt) Hogan, her supervisor, wanted Appellant returned to the hospital immediately.  Dr. Kenneth Gheen, the medical director of the pediatric intensive care unit at the hospital, was concerned that he had not had the chance to talk to Austin's parents and explain to them the seriousness of Austin's condition.  Rather than returning Appellant to the hospital at that time, Detective Malek-Madani contacted Sgt Hogan and told him that Appellant "had admitted to having shaken the baby and that [she] was hoping to capture that admission on videotape." Sgt Hogan responded that Dr. Gheen wanted Appellant back at the

hospital. But within five minutes, Sgt Hogan contacted Detective Malek-Madani again and advised her to continue the interview and that he would talk to the doctor again.

The interview continued at the police station. Detective Malek-Madani prodded Appellant for further admissions and a virtual tug-of-war ensued. The detective attempted to get Appellant to admit to shaking the baby, while Appellant tried to maintain his basic concession that he was only bouncing the baby and that he did not think that he had done anything to cause serious injury to Austin. For example, at one point, Appellant advised Detective Malek-Madani that he may have killed his son. But, within a few minutes, Appellant changed his story by saying that he thought Austin was choking on formula and he was not aware that Austin stopped breathing because Appellant was shaking him too hard. About fifteen minutes later, Appellant again admitted that he may have shaken Austin but that he thought he was only bouncing him. After approximately forty-five minutes of questioning, Detective Malek-Madani returned Appellant to the hospital.

The return to the hospital

According to the testimony of Dr. Gheen, when Appellant returned to the hospital, he told Dr. Gheen that he shook the child and laid him down, and that Austin vomited shortly thereafter. Dr. Nieca Caltrider, the pediatric ophthalmologist,

testified that Appellant told him he may have shaken Austin "some, a little harder than he should." Appellant said he laid Austin down, heard some gurgling sounds, and saw Austin vomit and then become gray.

DISCUSSION

I. Appellant's confession to Detective Malek-Madani

The Fifth Amendment to the Constitution prohibits any person from "be[ing] compelled in any criminal case to be a witness against himself." Article 31(d), UCMJ, prohibits the admission of statements obtained from an accused "through the use of coercion, unlawful influence, or unlawful inducement."[8] Thus, an accused's confession must be voluntary to be admitted into evidence.[9]

Whether a confession is voluntary is a question of law we will review de novo.[10] This review requires us to look to the totality of the circumstances to determine "whether the confession is the product of an essentially free and unconstrained choice by its maker."[11] In assessing the totality of the circumstances, we will look to factors such as: the mental condition of the accused; his age, education, and intelligence; the character of the detention, including the

---

[8] 10 U.S.C. § 831(d) (2000).
[9] United States v. Ellis, 57 M.J. 375, 378 (C.A.A.F. 2002).
[10] Id.
[11] United States v. Bubonics, 45 M.J. 93, 95 (C.A.A.F. 1996).

conditions of the questioning and rights warning; and the manner of the interrogation, including the length of the interrogation and the use of force, threats, promises, or deceptions.[12]

Undoubtedly, Appellant found himself in a stressful situation on the morning of his son's death. Austin was in critical condition in the hospital and Detective Malek-Madani was pressuring Appellant to confess to shaking his son. This pressure on Appellant continued for a few hours, both at the hospital and at the police station. Based on the totality of the circumstances, however, we conclude that Appellant's confession was voluntary.

At the time of Austin's death, Appellant was a twenty-two year-old Specialist with over five years of service in the Army. There is no evidence in the record that Appellant suffers from any type of mental deficiency or is of low intelligence.

When Detective Malek-Madani began questioning Appellant, he was cooperative and, upon her request, voluntarily accompanied her to the police station. Appellant was never under arrest, he was not constrained at any time, and he was questioned at the police station for no more than forty-five minutes before Detective Malek-Madani returned him to the hospital. Although not explicitly informed that he could leave, Appellant was free

---

[12] See Ellis, 57 M.J. at 379; United States v. Sojfer, 47 M.J. 425, 429-30 (C.A.A.F. 1998).

9

to terminate any of the interviews at any time.  We agree with the military judge that there is "scant evidence" that Appellant believed he was in custody or that he made false incriminating statements or admissions.

Appellant asserts that Detective Malek-Madani's "clear message" to him "was that he had to confess to shaking his son to permit the doctors to save Austin's life."  In other words, he had to confess or Austin would die.  As noted above, in assessing the totality of the circumstances, we will consider the detective's use of threats, promises, or deceptions.[13]  Under certain circumstances, threats or deceptions may overcome an individual's "free will" in making a confession.[14]

In Ellis, we held the appellant's confession was voluntary even though the investigating detectives told him they had

---

[13] Ellis, 57 M.J. at 379.

[14] Compare Lynumn v. Illinois, 372 U.S. 528, 534 (1963)(holding confession involuntary when police showed up at defendant's apartment to arrest her for the sale and possession of marijuana and advised her that if she did not cooperate, state financial aid for the children would be terminated and her children would be taken from her), with United States v. Brave Heart, 397 F.3d 1035, 1036-38 (8th Cir. 2005) (concluding confession was voluntary when defendant voluntarily drove himself to police station, consented to questioning for over two hours, was never placed under arrest, and confessed to killing his nephew after the officers stated they believed he was directly responsible for his nephew's injuries and suggested that his sister-in-law may share the responsibility) and United States v. Moreno, 36 M.J. 107, 112 (C.M.A. 1992) (holding confession voluntary when made to a social worker, who was not part of a law enforcement investigation, when appellant faced choice between cooperating with a social worker, or not cooperating and risk losing his children).

probable cause to arrest him for child abuse and that his children "would probably be removed" from his home if he was arrested.[15] In this case, the essence of Detective Malek-Madani's statements to Appellant was that the doctors needed to know exactly what happened to Austin so they could save his life. Detective Malek-Madani admits that she did not return Appellant to the hospital immediately after receiving the request from Sgt Hogan because she was more concerned with securing Appellant's confession than allowing Appellant to return to the hospital. Thus, similar to the detectives' statements in Ellis, Detective Malek-Madani's statements to Appellant were said with the intent to secure a confession from Appellant by "exploit[ing] any emotional ties [A]ppellant might have" to Austin.[16] But the statements were "an accurate picture" of what was happening to Austin.[17] And "[w]hile the detectives' advice to [A]ppellant . . . may have contributed to his confession, the mere existence of a causal connection does not transform [A]ppellant's otherwise voluntary confession into an involuntary one."[18]

---

[15] 57 M.J. at 377.
[16] Id. at 384 (Baker, J., concurring in the result).
[17] Id. at 379.
[18] Id.; see also Brave Heart, 397 F.3d at 1041 (noting that a police officer's intention to arrest the defendant "'does not render a confession involuntary per se,'" but is "simply one factor to be considered in the totality of the circumstances") (internal citations omitted).

Furthermore, we will look not only to what was said to Appellant, but "we must also examine what was not done or not said."[19] Detective Malek-Madani did not threaten Appellant in any way or physically injure him.[20] She was not confrontational or intimidating. Appellant was not detained, questioned for a prolonged amount of time, or held in isolation for any amount of time.[21] Based on the totality of the circumstances in this case, we hold Appellant's confession was voluntary.

Additionally, we are persuaded by the Government's argument that, regardless of whether Appellant actually believed the doctors would not help Austin unless he confessed, Detective Malek-Madani's statements would not provide a motive for Appellant to lie. If Appellant did not shake Austin, then telling the detective that he did shake him would not help the doctors determine how to treat the baby appropriately. For Appellant to lie about what he did would not save Austin's life.

---

[19] Ellis, 57 M.J. at 379; see also Brave Heart, 397 F.3d at 1041 (stating that officers "elicit confessions through a variety of tactics, including claiming not to believe a suspect's explanations, making false promises, playing on a suspect's emotions, using his respect for his family against him, deceiving the suspect, convening sympathy, and even using raised voices," but "[n]one of these tactics render the confession involuntary . . . unless 'the overall impact of the interrogation caused the defendant's will to be overborne'") (internal citation omitted).
[20] Ellis, 57 M.J. at 379.
[21] Id.

## II.  Denial of defense request for expert assistance

After the convening authority denied the defense counsel's request for expert assistance in the area of false confessions, the defense counsel raised the issue with the military judge before trial.  The defense counsel requested an expert consultant "not only" to address the vulnerability of Appellant's confession, but also to examine the "coercive interrogation techniques and how the use of those techniques in this case may shed light on the confession's reliability, not necessarily its voluntariness."  Defense counsel postulated that the expert would be in the best position to help the defense determine whether Appellant's emotional state at the time he made the confession was such that the unreliability of the confession would be a possible defense.  The military judge stated, "defense counsel is searching for evidence that would assist in her defense of the accused, but with little evidence to indicate such evidence exists."  The military judge then denied the request, concluding that the defense made an inadequate showing of the necessity for Dr. Richard Leo's assistance.

An accused is entitled to an expert's assistance before trial to aid in the preparation of his defense upon a

United States v. Bresnahan, No. 04-0559/AR

demonstration of necessity.[22]  But necessity requires more than

the "'mere possibility of assistance from a requested expert'. .

. ."[23]  The accused must show that a reasonable probability

exists "'both that an expert would be of assistance to the

defense and that denial of expert assistance would result in a

fundamentally unfair trial.'"[24]

   We apply a three-part test to determine whether expert

assistance is necessary.[25]  The defense must show:  (1) why

the expert assistance is needed; (2) what the expert

assistance would accomplish for the accused; and (3) why

the defense counsel were unable to gather and present the

evidence that the expert assistance would be able to

develop.[26]  A military judge's ruling on a request for

expert assistance will not be overturned absent an abuse of

discretion.[27]

   In determining whether the military judge abused his

discretion in denying the defense's request for an expert

consultant, each case turns on its own facts.  Neither the

---

[22] United States v. Gunkle, 55 M.J. 26, 31 (C.A.A.F. 2001)
(citing United States v. Garries, 22 M.J. 288, 291 (C.M.A.
1986)).
[23] Id. (citing United States v. Robinson, 39 M.J. 88, 89 (C.M.A.
1994)).
[24] Id. (quoting Robinson, 39 M.J. at 89).
[25] United States v. Gonzalez, 39 M.J. 459, 461 (C.M.A. 1994);
United States v. Ndanyi, 45 M.J. 315, 319 (C.A.A.F. 1996).
[26] Gonzalez, 39 M.J. at 461; Ndanyi, 45 M.J. at 319.
[27] Gunkle, 55 M.J. at 32.

14

denial nor the grant of a request for an expert consultant to explore the reliability of a confession is necessarily grounds for reversal. But, as this Court has previously noted, "[t]o reverse for 'an abuse of discretion involves far more than a difference in . . . opinion . . . .'"[28] Under the facts of this case, we hold that the military judge did not abuse his discretion by concluding that the defense failed to meet its burden of necessity under Gonzalez.[29]

The defense counsel requested Dr. Leo's expert assistance to help explore the possibility that Detective Malek-Madani's techniques at the hospital and at the police station were so coercive that Appellant's confession may have been unreliable. Appellant's confession to Detective Malek-Madani was important evidence for the prosecution. And we accept arguendo that Dr. Leo possessed knowledge and expertise in the area of police coercion beyond that of the defense counsel and that the defense counsel could benefit from his assistance.

---

[28] United States v. Travers, 25 M.J. 61, 62-63 (C.M.A. 1987)(internal citations omitted).
[29] 39 M.J. at 461 (holding that the military judge did not abuse his discretion in denying the defense's request for expert assistance where the defense was given the "tools potentially to gather evidence to lay a foundation for the necessity of an independent investigator" but did not use them).

But defense counsel never presented any evidence to suggest that Appellant's confession was actually false. Furthermore, the military judge clearly articulated in his findings of fact that the defense presented no evidence suggesting that Appellant suffers from any abnormal mental or emotional problems.[30] He also found no evidence suggesting that Appellant has a "submissive personality so weak or disoriented as to make false incriminatory statements in response to accusations of serious criminal conduct."

This was a close call. Just as we hold that the military judge did not abuse his discretion by denying the request, we would also conclude that the military judge would not have abused his discretion had he granted the request. Because the military judge was not clearly erroneous in his findings of fact and he did not base his decision on an incorrect view of the law,[31] we conclude that

---

[30] The military judge cited United States v. Hall, 93 F.3d 1337 (7th Cir. 1996).

[31] See United States v. Gore, 60 M.J. 178, 187 (C.A.A.F. 2004) (noting that a military judge will be reversed for an abuse of discretion only "'if the military judge's findings of fact are clearly erroneous or if his decision is influenced by an erroneous view of the law.'" "Further, the abuse of discretion standard of review recognizes that a judge has a range of choices and will not be reversed so long as the decision remains within that range.")(internal citations omitted).

he did not abuse his discretion in denying the defense's request for expert assistance.

III. Uncharged misconduct evidence

At trial, the Government attempted to introduce evidence of prior injuries to Austin, as indicative of child abuse. More specifically, the Government wanted to introduce X-rays and autopsy photographs that revealed that Austin had rib fractures that were inflicted four to eight weeks before he died.[32] The defense moved in limine to exclude the evidence. The military judge denied the motion.

At trial, Dr. Phillip Gunther, an expert in radiology and identification of nonaccidental trauma in children, testified about the injuries evident from the X-rays. After his testimony, the military judge sua sponte instructed the members that any evidence that Austin may have suffered injuries in the past could be considered only "for the limited purpose of its tendency, if any, to prove that the alleged injuries under consideration here were not caused by an accident or inadvertent act." The military judge stated, "it may also be used as proof that the accused may have intended to inflict those injuries because evidence of prior injuries may indicate an intent to injure." And he cautioned the members that because there was "no direct evidence that the accused inflicted" the prior

---

[32] Bresnahan, No. ARMY 20010304, slip op. at 2.

17

injuries, they may consider the evidence for the purpose of deciding intent only if they "conclude that the accused inflicted those injuries. . . ." Finally, he stated that the members should "not consider this evidence for any other purpose, and [they] may not conclude from this evidence that the accused is a bad person or has criminal tendencies and that he therefore committed the offense charged."

Later, Dr. David Bowerman, the coroner who performed the autopsy, also testified about the rib fractures. He stated that considering the "whole scenario," including the hemorrhage in the brain, the retinal hemorrhages, the swelling of the brain, and the healing rib fractures, Austin's injuries resulted from nonaccidental trauma. At the conclusion of his testimony, the military judge again instructed the members that the same instruction he gave earlier regarding the evidence of the rib fractures would apply to Dr. Bowerman's testimony.

Finally, at the conclusion of all the evidence presented by the Government and the defense, the military judge cautioned the members regarding the limited purpose for which they could consider the evidence that Austin suffered injuries in the past. He stated:

> Evidence that Austin Bresnahan may have suffered injuries in the past may be considered by you for the limited purpose of its tendency, if any, to prove that the alleged injuries under consideration here were not caused by an accident or inadvertent act. This is the same instruction I gave you earlier. Similarly, it may also be used as

18

proof that the accused may have intended to inflict these injuries because evidence of prior injuries may indicate an intent to injure. Note, however, that there was no direct evidence that the accused inflicted the prior injuries. Therefore, you may consider the evidence of prior injuries for purposes of deciding intent only if you conclude that the accused inflicted them. You may not consider this evidence for any other purpose, and you may not conclude from this evidence that the accused is a bad person or has criminal tendencies and that he therefore committed the offense charged.

Because no evidence exists that Appellant caused Austin's fractured ribs, the Army Court of Criminal Appeals determined that the military judge abused his discretion by admitting the uncharged misconduct evidence.[33] The Army Court concluded, however, that the admission was harmless based on the strength of the Government's case, the weakness of the defense case, and the limiting instructions given by the military judge.[34]

If a court concludes that uncharged misconduct evidence was erroneously admitted,[35] the military judge's decision will not be overturned "unless the error materially prejudices the substantial rights of the accused."[36] The harmlessness of the error will be evaluated by "'weighing: (1) the strength of the Government's case, (2) the strength of the defense case, (3) the materiality of the evidence in question, and (4) the quality of

---

[33] Id. at 5.
[34] Id. at 8-9.
[35] See United States v. Reynolds, 29 M.J. 105, 109 (C.M.A. 1989) (stating the three-part test for admissibility of uncharged misconduct and noting that the evidence must pass each of the three parts to be admissible).
[36] Article 59(a), UCMJ, 10 U.S.C. § 859(a) (2000).

the evidence in question.'"[37]  As a question of law, we will review the Army Court's application of the harmlessness factors de novo.[38]

We agree with the Army Court's conclusion that the error was harmless.  As described above, the Government's case was strong.  It consisted of Appellant's confession to Detective Malek-Madani that he may have shaken his baby, his statements to Dr. Gheen and Dr. Caltrider at the hospital that he shook Austin, and the testimony of five different doctors who each concluded that Austin died from being shaken.

Dr. Gheen and Dr. Donald Sceats, a neurological surgeon, both diagnosed Austin as having a subdural hematoma and subarachnoid hemorrhage and were both of the opinion that these injuries were consistent with shaken baby syndrome.  Dr. Caltrider detected retinal hemorrhaging in the baby's left eye.  Dr. Caltrider explained that in most shaken baby cases, hemorrhaging occurs in both eyes.  Unilateral retinal hemorrhaging is "not the most common type of presentation, but certainly in probably 20 percent of [shaken baby] cases, it has been reported to be unilateral."  Dr. Gunther, the radiologist, determined that Austin had acute swelling and bleeding in his

---

[37] United States v. McDonald, 59 M.J. 426, 430 (C.A.A.F. 2004) (citing United States v. Kerr, 51 M.J. 401, 405 (C.A.A.F. 1999)).
[38] United States v. Rodriguez, 60 M.J. 239, 246 (C.A.A.F. 2004).

brain.  He testified that he could narrow the time of injury to be within the last five to seven days.  Dr. Bowerman, the coroner, determined the cause of death to be "acute head trauma" and concluded that the retinal hemorrhage, healing bilateral rib fracture, and subdural and subarachnoid hemorrhage were consistent with child abuse and shaken baby syndrome.  This medical testimony clearly established the cause of death, and the defense did not contest that the nature of Austin's death was nonaccidental at trial.

If the members believed the doctors' testimony, then Austin died at the hands of either Appellant or his wife.  Appellant and his wife were the only two who were with Austin on the morning he died.  Moreover, both testified that Appellant was the one who carried Austin from the bedroom back to his bed and was therefore the last one to see Austin before he suffered his fatal injuries.

On the other hand, the defense case was weak.  A nurse-midwife testified that Appellant accompanied his wife to her prenatal appointments and seemed interested in the development of her pregnancy.  Major Craig Webb, M.D., an expert in pediatrics, child abuse syndrome, and child abuse, testified that Appellant's wife kept their home in a way that signaled neglect, increasing the risk of abuse.  Except for this testimony regarding the neglectful state of the home, the

defense put on no evidence that Appellant's wife, rather than Appellant, caused Austin's death. Major Webb also opined, however, that Austin ultimately died from shaken baby syndrome. Another doctor, Dr. Stephen Smith, testified that he disagreed with the conclusion that Austin died from shaken baby syndrome and concluded that instead he died from "a blunt flat blow" to the head. But Dr. Bowerman, the coroner, directly contradicted this testimony by testifying that he did not find any evidence of a blunt blow to Austin's head. Finally, one of Appellant's supervisors testified to his good duty performance.

During instructions, the military judge pointed out to the members three different times that no direct evidence existed that Appellant previously injured Austin. He cautioned the members that they could use the evidence for the limited purpose of "its tendency, if any, to prove that the alleged injuries under consideration here were not caused by an accident or inadvertent act."

Furthermore, the evidence of the healing rib fractures created little risk of unfair prejudice toward Appellant. The only viable suspects in this case, as noted above, were Appellant and his wife. Either could have caused the previous injury. Accordingly, the evidence did little, if anything, to suggest that it was Appellant rather than his wife who caused the fatal injuries to Austin. The evidence's true import was

that it made it more likely that Austin's fatal injury was caused by abuse rather than by accident -- an issue that was not in dispute.

Weighing the strength of the Government case against Appellant, including the materiality and quality of the Government's evidence, against the weakness of the defense case and the lack of any real risk of unfair prejudice to Appellant, we conclude that any error in admission of the uncharged misconduct evidence was harmless.

IV. <u>Profile evidence</u>

During cross-examination of Major Webb, the defense witness who attempted to establish Appellant's wife as the perpetrator, the trial counsel asked Major Webb if he was aware of a study that revealed that seventy-nine percent of all shaken baby cases are perpetrated by male caregivers. Major Webb acknowledged his awareness of the study. The trial counsel then asked Major Webb if he was aware of a second study, published four years later, which revealed that seventy percent of shaken baby cases were perpetrated by male caregivers. Major Webb similarly agreed that he was aware of the study. The defense did not object to these questions and responses. Appellant now asserts that the military judge committed plain error by allowing the Government to introduce inadmissible profile evidence against Appellant.

Under the plain error standard, Appellant must show that any error was plain and obvious and that it resulted in an "unfair prejudicial impact on the [members'] deliberations."[39] Profile evidence is defined as "evidence that presents a 'characteristic profile' of an offender, such as a pedophile or child abuser, and then places the accused's personal characteristics within that profile as proof of guilt."[40] Generally, the use of any "profile" characteristic as evidence of guilt or innocence is improper at a criminal trial.[41]  Profile evidence is admissible "only in narrow and limited circumstances."[42]  For example, it is admissible in rebuttal when a party opens the door by presenting potentially misleading testimony.[43]

In this case, we agree with the Government that the trial counsel was within the proper bounds of rebuttal when he cross-examined Major Webb about the study.  The defense had opened the door to such questioning by having Major Webb testify about various "factors" that pointed to Appellant's wife as the one who killed Austin.  Major Webb testified about the various

---

[39] United States v. Powell, 49 M.J. 460, 463 (C.A.A.F. 1998).
[40] United States v. Traum, 60 M.J. 226, 234 (C.A.A.F. 2004) (citing United States v. Rynning, 47 M.J. 420, 422 (C.A.A.F. 1998)).
[41] Id.
[42] United States v. Banks, 36 M.J. 150, 162 (C.M.A. 1992).
[43] Id.

stresses that Appellant's wife was under that increased the risk of child abuse. Such factors included a recent move, financial problems, the long hours Appellant worked that kept him away from the home, being the caretaker of two very young children, and having a chronically-ill child. Major Webb testified that Appellant's wife was responsible for the cleanliness of the household and that the conditions of the house indicated that she was neglectful in her housekeeping duties. Major Webb also testified that her neglect signaled abuse.

The trial counsel was responding to the defense's attempt to establish Appellant's wife as the perpetrator because she had bad habits of uncleanliness by highlighting the fact that two different studies found males to be the primary perpetrators in shaken baby cases. The trial counsel was not relying on the expert himself to establish that Appellant, as a male, was the perpetrator. In fact, the trial counsel did not use this evidence at all during the Government's case-in-chief. Rather, the trial counsel was questioning the witness's knowledge of studies performed by other doctors pointing to a characteristic of Appellant that was statistically linked to shaken baby cases to rebut Major Webb's testimony that certain factors pointed to Appellant's wife as most likely the perpetrator. The defense had opened the door to this otherwise impermissible question.

Moreover, even if the military judge erred in not sua sponte excluding such testimony, the error was not plain and obvious.  And, for many of the same reasons articulated in the harmlessness analysis in the uncharged misconduct issue above, any error in admitting this evidence was harmless.

## CONCLUSION

The decision of the United States Army Court of Criminal Appeals is affirmed.

United States v. Bresnahan, No. 04-0559/AR

ERDMANN, Judge, with whom EFFRON, Judge, joins (dissenting):

The majority holds that the military judge did not abuse his discretion in denying the defense request for expert assistance on the subject of false confession. Because I find that the military judge applied an incorrect standard to the defense request for expert assistance and that the defense made an adequate showing that expert assistance was necessary, I would hold that the military judge abused his discretion and would reverse the decision of the lower court.[1]

In denying the defense request for assistance from an expert consultant the military judge concluded:

>    a.   There is nothing in the evidence received to support any suspicion that Accused made false incriminating statements or admissions.
>
>    b.   Defense candidly admitted that it was requesting Dr. Leo's assistance to make a preliminary determination of whether accused made false statements. Stated differently, defense counsel is searching for evidence that would assist in her defense of accused, but with little evidence to indicate such evidence exists.

Similar to the military judge, the majority relies on a finding that "defense counsel never presented any evidence to suggest that Appellant's confession was actually false." United States

---

[1] Because I would reverse on Issue II, I would not reach the remaining issues.

v. Bresnahan, __ M.J. __, __ (16) (C.A.A.F. 2005).  The majority also notes that the military judge made findings of fact that support a conclusion that Bresnahan did not make a false confession.  Id.  In upholding this ruling of the military judge, I am concerned that the majority sets the bar unreasonably high for defendants who are seeking the assistance of an expert consultant in order to prepare and fairly present a defense.

Bresnahan needed to show a reasonable probability "'both that an expert would be of assistance to the defense and that denial of the expert assistance would result in a fundamentally unfair trial.'"  United States v. Gunkle, 55 M.J. 26, 31 (C.A.A.F. 2001) (quoting United States v. Robinson, 39 M.J. 88, 89 (C.M.A. 1994)).  The conclusion reached by both the military judge and the majority suggests that the "assistance to the defense" referenced in this test must be in the form of favorable testimony or favorable evidence.  Bresnahan, __ M.J. at __ (16).  However, when a defendant requests assistance from an expert consultant, rather than an expert witness, he should not initially be required to show conclusively that evidence favorable to his case exists.

"Consulting with an expert will often be a necessary precondition to establishing the expert's necessity as a witness."  United States v. Warner, __ M.J. __, __ (22)

2

(C.A.A.F. 2005). Trial defense counsel made clear to the military judge that "the defense is asking for an expert consultant at this time, not an expert witness . . . ." Bresnahan needed Dr. Leo's assistance to determine whether there was evidence to present in support of his contention that his confession was unreliable and that elements of it were false. If Bresnahan were able to develop evidence that his confession was false prior to receiving expert assistance, then he would not need the assistance at all. Requiring "evidence that such evidence exists" as the military judge did here is circuitous reasoning.

To address this "classic military defense counsel dilemma[,]"[2] where defense counsel requests an expert consultant I would require defense counsel to make a colorable showing that a given defense may be reasonably available to the defendant. Using the three-prong test from United States v. Gonzalez, 39 M.J. 459, 461 (C.M.A. 1994), the defendant would then be required to show that the expert consultant is necessary to evaluate and potentially present that defense.[3] In this instance, Bresnahan made just such a showing.

---

[2]United States v. Warner, __ M.J. __, __ (21) (C.A.A.F. 2005) (quoting United States v. Kreutzer, 59 M.J. 773, 777 n.4 (A. Ct. Crim. App. 2004), aff'd, 61 M.J. 293 (C.A.A.F. 2005)).
[3]I note also that this court has found defense counsel to have provided ineffective assistance where they have failed to explore potential defenses available to a defendant. See, e.g.,

Although Bresnahan's confession was voluntary and therefore admissible at trial, the defense counsel made a colorable showing that there was a reasonable possibility she could raise doubt in the members' minds as to the reliability of that confession.  This was a viable, distinct, and perhaps crucial avenue for the defense to explore.

> Confessions, even those that have been found to be voluntary, are not conclusive of guilt. . . . [S]tripped of the power to describe to the jury the circumstances that prompted his confession, the defendant is effectively disabled from answering the one question every rational juror needs answered:  If the defendant is innocent, why did he previously admit his guilt?

Crane v. Kentucky, 476 U.S. 683, 689 (1986).

---

United States v. Wean, 45 M.J. 461, 463 (C.A.A.F. 1997) (finding that one of the bases for a finding of ineffective assistance by trial defense counsel was that "defense counsel's approach to the use of expert witnesses by the Government, coupled with his omission in not using expert testimony, demonstrated a lack of understanding of the law and a failure to properly research and investigate appellant's case."); United States v. Scott, 24 M.J. 186, 192 (C.M.A. 1987) ("A defense counsel has 'the duty . . . to conduct a prompt investigation of the circumstances of the case and to explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction.'") (quoting ABA Standards, The Defense Function, Standard 4-4.1 (2d ed. 1979)).  Trial defense counsel was attempting to diligently explore the circumstances surrounding Bresnahan's confession and the meaning of those circumstances. The confession was critical evidence in the Government's case. Had she not attempted to explore the reliability of this confession Bresnahan may well have had a case for ineffective assistance of counsel, and yet she was thwarted in her attempt by the military judge's denial of an expert consultant to assist her.

Trial defense counsel told the military judge that the defense was focusing on Bresnahan's emotional state at the time of the confession because "as noted by some of the literature, in situations where there are child abuse, medical questions asked, those are situations that can typically have the counterintuitive notion of false confessions come about." She also identified for the military judge several factors based on her own research that might suggest that Bresnahan gave a false confession including: (a) the sophistication of the interrogators; (b) the fact that Bresnahan was not able to speak to doctors about the condition of his son; and (c) the fact that the interrogator told Bresnahan that he needed to tell her what he did to his son so that the doctors could save his son's life. Finally, she noted that this research was the defense's:

> feeble attempt to do what the defense expects Dr. Leo will do with precision and expertise -- review the evidence, interview the witnesses, apply known factors in his field of expertise to the facts of this case and determine the likelihood of a false or coerced confession based on the employment of coercive interrogation techniques.
>
> . . . The defense can go no further in developing this line of defense and needs expert assistance. Perhaps the defense can go no further even with this assistance, but the defense needs an expert to so advise or to help further develop this defense.

Not only did defense counsel show that an attack on the reliability of the confession was reasonably available, the

5

three-prong Gonzalez test was also satisfied.  Trial defense counsel made clear that she needed the expert to explore and help develop the case and the possibility that parts of Bresnahan's confession were false.  The need for an expert consultant was supported by a detailed summary of the scientific validity and difficulty of this issue as well as a list of several factors indicating coercive techniques that might have lead Bresnahan to give a false confession.

Defense counsel explained that the expert could recognize and identify factors in the interrogation process and in Bresnahan's emotional state that might support this contention. She also explained that her own research was not enough to allow her to fully explore the subject because there was too much material and evaluating it required greater expertise than she possessed.  In particular, defense counsel noted that because of the depth and complexity of this area, the defense could not properly educate itself in this area for trial.

Under these circumstances it is clear that the expert assistance Dr. Leo could provide was necessary to the defense. The majority does not contest the fact "that Dr. Leo possessed knowledge and expertise in the area of police coercion beyond that of defense counsel and that the defense counsel could benefit from his assistance."  Bresnahan, __ M.J. at __ (15). Furthermore, it is clear that without the assistance of Dr. Leo,

trial defense counsel was denied the opportunity to explore a reasonable issue that went to the center of the Government's case.  If the members had found Bresnahan's confession unreliable then they might not have found beyond a reasonable doubt that he had caused the injuries to Austin.  Denying Bresnahan the opportunity to present this defense therefore resulted in a "fundamentally unfair trial."  Gunkle, 55 M.J. at 31.

I would find that the military judge abused his discretion in denying the defense request for expert assistance, reverse the decision of the United States Army Court of Criminal Appeals, set aside the findings and sentence, and authorize a rehearing.