# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
TOZZI, CAMPANELLA, and CELTNIEKS
Appellate Military Judges

**UNITED STATES, Appellee**
v.
**Specialist JUSTIN S. CANNON**
**United States Army, Appellant**

ARMY 20130415

Headquarters, U.S. Army Combined Arms Center & Fort Leavenworth
Jeffery R. Nance, Military Judge
Colonel Fred P. Taylor, Staff Judge Advocate (pretrial)
Colonel John S.T. Irgens, Staff Judge Advocate (post-trial)

For Appellant:  Captain Patrick J. Scudieri, JA (argued); Colonel Kevin Boyle, JA; Lieutenant Peter Kageleiry, Jr., JA; Major Vincent T. Shuler, JA; Captain Patrick J. Scudieri, JA (on brief).

For Appellee:  Captain Jaclyn E. Shea, JA (argued); Colonel John P. Carrell, JA; Lieutenant Colonel James L. Varley, JA;  Major John K. Choike, JA; Captain Jaclyn E. Shea, JA (on brief).

23 June 2015

---------------------------------
OPINION OF THE COURT
---------------------------------

CAMPANELLA, Judge:

A panel of officer and enlisted members sitting as a general court-martial convicted appellant, contrary to his pleas, of unpremeditated murder, in violation of Article 118, Uniform Code of Military Justice, 10 U.S.C. § 918 (2006)  [hereinafter UCMJ].  The panel sentenced appellant to a dishonorable discharge, confinement for fifty years, forfeiture of all pay and allowances, and reduction to the grade of E-1. The convening authority approved the adjudged sentence and credited appellant with 142 days of confinement credit against his sentence to confinement.

This case is before us for review pursuant to Article 66, UCMJ. Appellant raises two assignments of error. Both warrant discussion but not relief. First, appellant asserts the military judge abused his discretion by denying appellant's request for an expert consultant in the area of coercive law enforcement interrogation techniques. We agree that the military judge did not appropriately differentiate the standards of review for providing expert assistance versus an expert witness in his written findings of fact and conclusions of law. In conducting our own analysis, however, we agree with his ultimate conclusion that appellant did not carry the burden of demonstrating his entitlement to false confession expert assistance. Second, appellant asserts the military judge committed plain error by admitting an "inadmissible rock" and presumptive positive hemoglobin test. We find neither plain nor prejudicial error here. We also find the matters raised personally by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982) are without merit.

## BACKGROUND

Appellant was convicted of the unpremeditated murder of MG. The government's central piece of evidence in this case was appellant's confession. This confession was subject to substantial pretrial litigation, and we recount both the details surrounding MG's death and appellant's later confession.

a. *The Death of Appellant's Wife*

On 27 July 2011, appellant received word that his 16-year old wife was found dead in a Missouri hotel room. She had died of a drug overdose. Appellant immediately flew home to Missouri on emergency leave and met with the investigator looking into the circumstances of his wife's death. Appellant appeared agitated and angry when discussing the investigation with a local police investigator. As a result, the investigator cautioned appellant to not interfere with the investigation. Appellant responded to the investigator, "I can only get in trouble if I get caught."

b. *The Camping Trip*

On 29 July 2011, appellant went camping at Lake Truman, Missouri, with six others – three males and three females. The reasons for the trip included celebrating the college graduation of one of the females and to mourn the death of appellant's wife.

During the evening, appellant and one of the males, MG, argued loudly, apparently over MG's former sexual relationship with appellant's wife. The quarrel culminated with MG saying he was sorry to appellant, and appellant replying with words to the effect of, "Oh-it's cool," and "I know my wife messed around."

Appellant and MG then hugged and went on with their evening, gathering with the others around the campfire.

The next morning appellant traveled back to town to plan his wife's funeral. He returned to Lake Truman at 2100, ate dinner with the group, and went to sleep some time after midnight. Because of rain, the group slept inside the two vehicles that evening. MG slept in the back seat of appellant's truck cab, appellant slept in the front seat, and one of the girls, MG's former fiancée, slept in the covered bed of the truck. The others slept inside the second vehicle.

Early the following morning of 31 July 2011, MG could not be located. After an unfruitful search for MG, the group called the police for help. Appellant left the lake around 0900 to pick up a friend at the airport while the others stayed to search for MG. Appellant returned to the lake with his friend around 1400 that afternoon. The friend loaned his phone to police to assist in the search. Appellant left the lake around 1600 to attend his wife's wake that evening, followed by dinner with his family and others who attended the wake. That evening, after an emotional day, appellant was driven home by his friend.

c. *The Interrogation*

The following day, appellant went to a department store, bought a suit, and went directly to his wife's funeral. After the funeral at about 1530 hours, accompanied by his brother and others, appellant went to the Sheriff's Office to retrieve his friend's phone. While there, appellant agreed to an investigator's request to be interviewed. Appellant was taken to a locked interview room with a two-way mirror and read his *Miranda* rights. Appellant waived his rights and provided a written statement denying any knowledge of the cause of MG's disappearance.

The investigator discussed the statement with appellant and became suspicious of appellant's involvement due to his demeanor and the contents of his written statement. The investigator left the room and spoke to the local prosecutor.

The investigator re-entered the room and told appellant he would be recording the interview. He reminded appellant of his *Miranda* rights, which appellant waived a second time, then the investigator continued to question him. Appellant changed his story after the investigator told him MG had been found dead in the water. Appellant's second written sworn statement indicated appellant had found MG already unconscious near the campfire, got scared, and placed MG's body in the lake. Finding the story incomplete and unbelievable, the interrogator continued to question appellant.

3

Upon further questioning, appellant confessed shortly thereafter to throwing a rock at the back of MG's head, causing MG to have an epileptic seizure and become unconscious. Appellant then moved MG's unconscious body into the water and went back to sleep. Appellant stated he only intended to scare MG that night, not kill him. Appellant also admitted he was angry and did this because MG told appellant he had slept with appellant's wife.

The investigator's tone throughout the recorded portion of the interrogation was supportive and understanding. He did not raise his voice or threaten appellant. The interrogation technique consisted of telling appellant there was little doubt as to his involvement and progressively making appellant more comfortable with making admissions by offering appellant justifications for his behavior. Much of the information appellant admitted originated with the investigator. During the interrogation, appellant also drew a sketch for the investigator outlining where the events took place.

d. *Motion for Expert Assistance*

Appellant was charged with the premeditated murder of MG. After the convening authority denied defense's request for expert assistance, appellant motioned the trial court to compel the expert assistance of a forensic psychologist - a purported expert in the study of coercive interrogations. The psychologist did not testify during the motion hearing. Instead, appellant provided the curriculum vitae of the psychologist and outlined why the assistant was needed and how he would be used. In support of the motion, appellant signed an affidavit disavowing his confession. Also, prior to trial, a Rule for Courts-Martial [hereinafter R.C.M.] 706 board diagnosed appellant with "Bereavement" under the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition. After both written and oral submissions, the military judge denied the defense's motion to compel the "false confession" expert consultant. Appellant now argues the military judge erred in denying his motion for expert assistance.

e. *The Rock and Presumptive Blood Test*

A week after appellant's confession, the detective who interrogated appellant went to the lake crime scene and found a rock on top of some grass that he thought looked out of place and fit appellant's confession, given its size and location. The rock had two reddish spots on it that the detective believed to be blood. At trial, without objection from defense, the detective testified that he used a field test on the rock to test for the presence of hemoglobin. That test turned olive-green, which purportedly indicates the presence of blood. On cross-examination, the detective conceded that to the best of his knowledge, the confirmatory test conducted by the crime laboratory did not detect any blood or DNA on the rock.

The government initially attempted to admit a photograph of the rock. Appellant objected based upon the best evidence rule, stating, "We feel that [trial counsel] should produce the rock." The military judge next confirmed that the trial counsel had possession of the rock and then stated, "Okay, well, we'll put it in tomorrow." Defense counsel replied, "Yes, Your Honor." At an Article 39(a) session later that day, the defense asked the military judge to ensure that the rock would be present the next day and stated, "we will put it in." The next day, the government offered the rock into evidence. When asked if he had any objection to the evidence, defense counsel replied, "No objection, Your Honor." Appellant now complains the military judge committed plain error by admitting the rock and the inadmissible presumptive hemoglobin test.

## LAW AND DISCUSSION

### I.  *False Confession Expert Assistance*

We review a military judge's decision to deny a request for expert assistance for an abuse of discretion. *United States v. Bresnahan*, 62 M.J. 137, 143 (C.A.A.F. 2005). A military judge abuses his discretion when: (1) the findings of fact upon which he predicates his ruling are not supported by the evidence of record; (2) if incorrect legal principles are used; or (3) if his application of the correct legal principles to the facts is clearly unreasonable. *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010) (citing *United States v. Mackie*, 66 M.J. 198, 199 (C.A.A.F. 2008)).

Moreover, "[w]hen judicial action is taken in a discretionary matter, such action cannot be set aside by a reviewing court unless it has a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon weighing of the relevant factors." *United States v. Houser*, 36 M.J. 392, 397 (C.M.A. 1993).

If the defense demonstrates that expert assistance is relevant and necessary, then an expert shall be employed at government expense to assist the defense. R.C.M. 703(d). Upon a proper showing of necessity, an accused is entitled to expert assistance. *United States v. Ford*, 51 M.J. 445, 455 (C.A.A.F. 1999) (quoting *United States v. Burnette*, 29 M.J. 473, 475 (C.M.A. 1990)). "[N]ecessity requires more than the 'mere possibility of assistance from a requested expert.'" *Bresnahan*, 62 M.J. at 143 (quoting *United States v. Gunkle*, 55 M.J. 26, 31 (C.A.A.F. 2001)). "The accused must show that a reasonable probability exists both that an expert would be of assistance to the defense and that denial of expert assistance would result in a fundamentally unfair trial." *Id*. (quoting *Gunkle*, 55 M.J. at 31).

In *United States v. Gonzalez*, 39 M.J. 459, 461 (C.M.A. 1994), our superior court set forth a three-part test to determine whether expert assistance is necessary: (1) why the expert assistance is needed; (2) what the expert assistance accomplishes for the accused, and (3) why the defense counsel were unable to gather and present the evidence that the expert assistant would be able to develop.

We first turn to the military judge's written findings of fact. While the military judge's findings of fact are not inaccurate, they are incomplete, thereby meriting less deference. *Cf. United States v. Benton*, 54 M.J. 717, 725 (Army Ct. Crim. App. 2001) (giving less deference to a military judge's ruling where he did not engage in fact-finding on the record). We find additional relevant facts related to appellant's request for expert assistance as follows: 1) appellant's affidavit that his confession was false; 2) appellant's lack of sleep preceding his interrogation; 3) appellant's emotional state and the diagnosis of bereavement in the R.C.M. 706 examination; 4) appellant's initial denial of involvement in MG's disappearance; and 5) the timing of the interrogation immediately following appellant's wife's funeral.[1]

We next look to the legal principles used by the judge. We note in his written ruling, the military judge correctly identified the relevant factors to determine whether appellant was entitled to expert assistance. We further note the military judge specifically stated on the record during the motions hearing that he was not considering the issue of whether the expert could testify for purposes of the request for expert assistance.

Unfortunately, the military judge's written analysis does not appear to follow his oral assurance. The military judge's written ruling blurred the standards between a request for expert assistance and a request for an expert witness. Initially, the military judge correctly noted the reason for the expert assistance request was because the defense identified indicia of a possible false confession, and they needed an expert to help them evaluate the case. The military judge then wrote as follows:

> *This argument assumes that so called false confession opinion testimony would be relevant and admissible under the rules of evidence and applicable law.* Furthermore, the defense has not shown why they are not able to marshal the facts as they have done in their brief, present those to the trier of fact, argue that the statement of the accused should not be considered reliable, and ask for an instruction on voluntariness to determine the weight to be given to the statement. If a statement is admitted into

---

[1] The Supreme Court has noted this court's authority under Article 66(c), UCMJ, to "revise factual determinations." *Ryder v. United States*, 515 U.S. 177, 188 (1995).

> evidence, the defense must be permitted to present evidence as to the voluntariness of the statement.  The military judge in such a case must instruct the members to give weight to the statement as it deserves under all circumstances . . . .  The defense has failed to show why they need the assistance of [Doctor B] to accomplish this basic defense counsel function.  Certainly, the defense can and has gathered and presented the evidence on their own – for this motion in fact.  *According to defense, [Doctor B] could not help the defense determine or even opine whether the confession was false.  Even if he could, such testimony, were it eventually offered, would not be allowed because an expert may not act as a human lie detector.*  (emphasis added)

The military judge appears to have conflated the distinction between a request for expert assistance and a request for an expert witness to provide testimony at trial.  Whether expert witness testimony is or is not admissible is not necessarily relevant or dispositive to the analysis under *Gonzalez* when ruling whether the defense met their burden to demonstrate necessity.  We are troubled by the military judge's concerns related to expert testimony admissibility and the weight he may have given it when deciding to deny the request for expert assistance.  As such, we conclude the military judge based his decision on an incorrect application of the law, and we are left to review this issue de novo.  *See United States v. Manns*, 54 M.J. 164, 166 (C.A.A.F. 2000) (conducting its own balancing test when a military judge does not articulate his reasoning on the record).

Turning again to the *Gonzalez* factors, we look to the validity of appellant's claim to determine the necessity of the requested expert assistance.  In *Bresnahan*, the appellant requested an expert assistant to examine the coercive interrogation techniques used by a civilian detective, but the defense failed to present evidence that appellant's confession was actually false or that appellant suffered from any "abnormal mental or emotional problems," or possessed a "submissive personality" that would cause him to falsely confess.  62 M.J. at 143.  The court in *Bresnahan* ultimately held that the military judge did not abuse his discretion when he denied the defense request for expert assistance as the defense did not meet its threshold evidentiary burden under *Gonzalez*.  *Id*. at 143-44.

Here, as in *Bresnahan*, we find that the defense has failed to meet its evidentiary burden in demonstrating need.  While the defense has offered some suggestions that appellant's confession may have been false (including appellant's

self-serving affidavit disavowing his confession),[2] defense counsel ultimately admitted the request for expert assistance was needed to *help them determine the voluntariness and trustworthiness* of the appellant's confession. Defense counsel does not provide evidence that appellant was susceptible to coercion, of low intelligence, or had any mental disorder or condition that might make it more likely that he confess falsely. While appellant was diagnosed with bereavement at his R.C.M. 706 board, defense counsel failed to link this assessment to the notion of false confession. In fact, defense counsel specifically stated it needs expert assistance to run a series of psychological tests *to determine* if appellant suffered from "intellectual deficits" impacting his ability to process information or if he was open to suggestibility without offering evidence to support this hypothesis.

Trial defense counsel also failed to proffer any information or professional studies related to false confession issues to demonstrate the link to this case and failed to present testimony of the expert on the record. Further, defense counsel justified their request for an expert assistant to review whether the interrogation method applied by the investigator was suggestive or coercive. We find defense's proffer does not demonstrate necessity and amounts to the "mere possibility of assistance" from a requested expert. *Id.* at 143 (quoting *Gunkle*, 55 M.J. at 31). For the third factor, defense counsel did not adequately meet their evidentiary burden to demonstrate why the defense team could not gather and present the evidence that the expert assistant would be able to develop in this case. *See Gonzalez*, 39 M.J. at 461.

We agree with the ultimate conclusion that the defense motion for expert assistance should have been denied based on what the defense proffered.

## II. *The Presumptive Hemoglobin Test and Admission of the Rock*

Appellant argues the military judge committed plain error by admitting a rock and the presumptive hemoglobin test and that he was prejudiced by this admission. As a threshold matter, we must determine whether appellant expressly waived the right to challenge the admissibility of this evidence or merely forfeited the issue. *See United States v. Campos*, 67 M.J. 330, 331 (C.A.A.F. 2009) (identifying the determination as to whether an issue is affirmatively waived or forfeited as a "threshold issue"). We hold appellant affirmatively waived any claim regarding the rock and forfeited his claim regarding the presumptive blood test.

"A forfeiture is basically an oversight; a waiver is a deliberate decision not to present a ground for relief that might be available in the law." *Id.* at 332 (citation

---

[2] By placing this disavowal in a sworn statement, appellant was not cross-examined regarding it. Appellant's statement does not explain what portions of his confession were false or what occurred during the interrogation that produced a false confession. We accordingly give this disavowal less weight.

omitted). Here, we are convinced appellant deliberately decided not to object to the admission of the rock. In fact, he requested the government to produce it instead and then did not object to its admission. He cannot now on appeal claim that it was erroneously admitted. *See Johnson v. United States*, 318 U.S. 189, 201 (1943) ("We cannot permit an accused to elect to pursue one course at the trial and then, when that has proved to be unprofitable, to insist on appeal that the course which he rejected at trial be reopened to him.").

With regard to the presumptive hemoglobin test, appellant forfeited his claim by not objecting to it. To show plain error, appellant must show: "(1) there was error; (2) the error was plain or obvious; and (3) the error materially prejudiced a substantial right of the accused." *United States v. Tunstall*, 72 M.J. 191, 193-94 (C.A.A.F. 2013) (quoting *United States v. Girouard*, 70 M.J. 5, 11 (C.A.A.F. 2011)).

Appellant relies on our decision in *United States v. Hill*, 41 M.J. 596, 598 (A.C.M.R. 1994), where we determined a "luminol test" that was "presumptive positive" for blood on clothing was inadmissible. The parties in *Hill* litigated that issue at trial. In this case, however, the record does little to enlighten this court as to the reliability of the test. *See* Mil. R. Evid. 702. We do not know the type of blood-testing kit used, whether it has been tested or subjected to peer-review, the potential error rate, the standards used to control its operation or the degree of its acceptance in the scientific community. We also do not know if the test is able to discern between human and animal blood.

However, the absence of these answers cuts against appellant in a plain error review because he did not challenge this evidence or otherwise request a *Daubert* hearing to test the reliability of the blood test. Given the lack of litigation regarding the blood test, we do not have a factual basis to determine whether this blood test is analogous to the inadmissible test in *Hill*. Appellant has not met his burden in demonstrating that the admission of the blood test was plain or obvious error.

That said, even were we to find plain and obvious error, appellant has not demonstrated prejudice by the admission of the blood test. The evidence does little either to add strength to the government's case or detract from the defense's case. Absent the rock, the government's case is strong with a confession from appellant, a motive, an opportunity, and the victim's body to corroborate the confession. Additionally, defense counsel conducted an effective cross-examination of the investigator regarding the negative lab testing of the rock, making its value to the government's case scant. We conclude appellant has demonstrated no clear, obvious error by which he was prejudiced with regard to the military judge's ruling to allow the rock and presumptive blood test into evidence.

**CONCLUSION**

Upon consideration of the entire record and the submissions of the parties we hold the findings of guilty and the sentence are AFFIRMED.

Senior Judge TOZZI and Judge CELTNIEKS concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court