# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
KERN, ALDYKIEWICZ, and MARTIN
Appellate Military Judges

**UNITED STATES, Appellee**
**v.**
**Specialist MATTHEW D. BELL**
**United States Army, Appellant**

ARMY 20100266

Headquarters, Fort Bliss
Michael J. Hargis, Military Judge
Colonel Michael J. Benjamin, Staff Judge Advocate (pretrial)
Colonel Francis P. King, Staff Judge Advocate (post-trial)

For Appellant: Lieutenant Colonel Peter Kageleiry, Jr., JA (argued); Major Jacob D. Bashore, JA; Lieutenant Colonel Peter Kageleiry, Jr., JA (on brief); Lieutenant Colonel Peter Kageleiry, Jr., JA (reply brief).

For Appellee: Captain Sasha N. Rutizer, JA (argued); Lieutenant Colonel Amber J. Roach, JA; Major Robert A. Rodrigues, JA; Captain Sasha N. Rutizer, JA (on brief).

22 March 2013

---------------------------------------
OPINION OF THE COURT
---------------------------------------

MARTIN, Judge:

A military judge sitting as a general court-martial convicted appellant, consistent with his pleas, of one specification of aggravated sexual assault of a child and one specification of abusive sexual contact with a child, in violation of Article 120, Uniform Code of Military Justice, 10 U.S.C. § 920 (2006 & Supp. I 2007) [hereinafter UCMJ]. Contrary to his pleas, a general court-martial composed of officer and enlisted members found appellant guilty of one specification of indecent acts or liberties with a child in violation of Article 134, UCMJ,[1] and found him not

---

[1] The Article 134, UCMJ, offense "Indecent acts or liberties with a child" covered misconduct, as alleged, between 1 February 2007 and 31 August 2007, a period of

(continued . . .)

guilty of a second specification of indecent acts or liberties with a child. The panel sentenced appellant to a dishonorable discharge, confinement for twenty-five years, forfeiture of all pay and allowances, and reduction to the grade of E-1. The convening authority approved only twenty-four years and six months' confinement, but otherwise approved the adjudged sentence and credited appellant with two days of confinement against the sentence to confinement.[2]

Appellant's case is before this court for review pursuant to Article 66, UCMJ. Appellant raises five assignments of error, three of which merit discussion.[3] First, appellant argues the military judge abused his discretion when he denied the defense motion to compel appointment of a false confession expert as an expert assistant and as an expert witness. Next, appellant argues the military judge abused his discretion when he admitted testimony of a witness's prior consistent statements. Finally, appellant alleges the Article 134, UCMJ, specification of which he was convicted fails to state an offense because it does not allege the terminal element for a Clause 1 or Clause 2 violation. We disagree with appellant's first two assertions but agree that appellant's latter assertion necessitates the relief granted in our decretal paragraph.

## I. BACKGROUND

Appellant and his wife became friends with Sergeant (SGT) RF and his wife, Mrs. DF, soon after they arrived at Fort Bliss, Texas, in 2006. Appellant and SGT RF were assigned to the same unit and deployed to Iraq together in October 2006. In December 2006, appellant was shot in the shoulder while serving in Iraq and re-deployed to Fort Bliss for medical treatment. Soon after he returned, he separated from his wife and later started a relationship with SGT RF's wife, Mrs. DF, while SGT RF remained deployed to Iraq. During this time, appellant began spending more time at SGT RF's home and spent time with SGT RF's two young daughters, SF and MF, who were then six and four years old.

---

(. . . continued)

time pre-dating the amendment to Article 120, UCMJ, which deleted "Indecent acts or liberties with a child" as an Article 134, UCMJ, offense effective 1 October 2007. *See Manual for Courts-Martial*, *United States* (2005 ed.), pt. IV, para. 87.b., *deleted by* Exec. Order No. 13447, 72 Fed. Reg. 56179 (Sep. 28, 2007).

[2] No rationale was provided for the six-month reduction in sentence.

[3] We have also considered those matters personally raised by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A 1982), and we find they warrant no discussion or relief.

In the summer of 2007, the children were sent to Mississippi to stay with their grandparents, Mr. CG and Mrs. TG. By that time, the extended family had learned of the relationship between appellant and Mrs. DF. One night in late October/early November 2007, Mr. CG witnessed SF and MF "laying [sic] as lovers" and "kissing." He was shocked, and immediately alerted the girls' grandmother, Mrs. TG. When Mrs. TG asked the girls where they had witnessed that type of behavior, the girls replied they had seen their mother with appellant. Mrs. TG then asked whether anyone touched them where they should not be touched. They replied that appellant had touched them. This set into motion a series of events that included reporting to the Mississippi state child services and Criminal Investigation Command (CID) at Fort Bliss, Texas.

## A. CID Interview of Appellant

Appellant was questioned by CID on 7 and 8 November 2007 at Fort Bliss. The interviewing agent, Special Agent (SA) RO, was a new agent, serving as an apprentice. Special Agent RO was not actually assigned to appellant's case, but was directed to interview appellant because the lead agent was not available. Prior to the interview, SA RO did not review the case-file, and he had been told minimal information regarding the allegations. He knew two young girls had made allegations that appellant touched their vaginas and knew appellant was in a relationship with the girls' mother. He did not know when the alleged acts took place, the extent of the touching, or the circumstances of the alleged touching.

Appellant's interview began at approximately 1800 hours on 7 November 2007. When SA RO asked if appellant knew why he was there, appellant told him that it was due to an incident with MW, a fourteen-year-old dependent of another soldier. The agent was surprised, as he had no information about MW, and continued the interview, focusing on SF and MF first, returning to the incident with MW later. The agent did not tell appellant very much about the allegations or the investigation—in large part because he himself knew very little about the incidents. Appellant initially denied any inappropriate conduct. After a period of time,[4] however, he admitted that he had often tickled and played with the girls, on one occasion accidentally touching SF's vagina. Instead of pulling away, appellant pulled SF's panties to the side and digitally penetrated her vagina for about thirty seconds, then withdrew his finger. When SF started to cry, appellant apologized to

---

[4] The exact amount of time appellant denied the contact with SF and MF was disputed throughout the pretrial motions and the trial. The testimony established that the time period could have been as little as twenty minutes or as long as two hours.

her. He provided much detail regarding this particular touching in his sworn statement. He then described two other instances where he claimed that he unintentionally touched SF's vagina. He also discussed one occasion where he accidentally touched the vagina of the younger daughter, MF. For all instances, he described the approximate time, date, and location of the touching; what the girls were wearing; the extent and circumstances of the touching, including which hand and finger he used; whether the touching was under or over the clothing, inside or outside of the vagina; and in the case of SF, the extent of the digital penetration and what the inside of her vagina felt like. These facts formed the basis of the indecent act charges.

After the conclusion of the discussion regarding SF and MF, SA RO then returned to the subject of MW. Appellant met MW through her stepfather, another soldier assigned to the same unit. Appellant became friends with the family, and he knew that MW was under sixteen years of age. Late one night in October 2007, he engaged in an online, instant messaging conversation with MW. The messages grew increasingly flirtatious, and they decided to meet. Appellant left the home of Mrs. DF, where he was staying, and picked up MW at her home. He then drove her to a high school parking lot in El Paso, Texas. Once parked, appellant stated they began kissing, she touched his penis, and he touched her breasts, buttocks, and digitally penetrated her vagina. He then drove MW back to her home on Fort Bliss. Appellant failed to state MW also performed fellatio on him, a fact investigators only learned of after they interviewed MW. These facts formed the basis of the aggravated sexual assault and abusive sexual contact charges to which appellant pleaded guilty.

Appellant's interview and the preparation of one sworn statement pertaining to SF and MF and another sworn statement pertaining to MW took several hours and went into the early morning hours of 8 November 2007. During the court-martial, SA RO testified that while appellant shared the details of his encounter with MW fairly easily, he seemed much more hesitant and took much more time to describe the circumstances involving the two young sisters, SF and MF. During the interview, SA RO afforded appellant several breaks, offered him food (which he declined), and provided him with water to drink. Special Agent RO also told appellant that the girls were too young to make up the allegations, when, in fact, he had never met the girls and did not know their circumstances.

At the time of the interview, appellant was twenty-two years old, he had a General Technical (GT) score of 122 and his Military Occupational Specialty was a Medic. He was scheduled to be medically discharged from the Army on 8 November 2007 for his shoulder injury. While he had been prescribed various medications to help him sleep and to help with pain caused by the gunshot wound to his shoulder, there was no evidence presented that appellant was under the influence of the prescribed medications at the time of the interview. There was also no evidence that

4

he had abused those prescribed medications, or any other drugs or alcohol, in the past. There was evidence appellant was responsive, was of average intelligence,[5] actively participated in the interview, and did not appear to be under the influence of drugs or alcohol. There was evidence that during this time period, appellant suffered from the effects of chronic Post Traumatic Stress Disorder (PTSD) due to his combat experience and the interview may have "reactivated some PTSD issues." However, despite defense counsel's attempt to elicit testimony from appellant's treating psychiatrist, there was no evidence that affirmatively tied appellant's PTSD to his reactions, the admissions made, and appellant's behavior during the CID interview.

## B.  Forensic Interview of SF and MF

On 6 December 2007, Ms. KC conducted a forensic interview with SF and MF at the Child Advocacy Center located in South Mississippi near their grandparents' home. Both interviews were videotaped. SF, who was six years old at the time of the interview, indicated that "Matt" (referring to appellant, Specialist Matthew Bell) touched her private spot with his finger. SF told Ms. KC that appellant stuck his finger inside her "private spot," rubbed it, and it hurt. She described the touching as "like a rock fell down in it." She said the touching occurred when her dad was deployed to Iraq, her mom was out of the house, and she was home alone with appellant. SF denied appellant ever forced her to touch him. SF also told Ms. KC of a second touching but did not provide any details. Her sister, MF, was only four years old at the time of the interview. MF told Ms. KC that "Matt" touched her vagina with his hand, over her underwear. Due to her age, she struggled to identify a location where this incident occurred and could not articulate many details. MF indicated appellant touched her ten times, but it was not clear if she meant appellant touched her repeatedly on one occasion or if appellant touched her on ten separate occasions.

## C.  The Testimony at Court-Martial

By the time of trial, SF was eight years old. She testified fairly consistently with the background information that she previously provided during the forensic interview. SF testified she was alone with appellant in the house while her mom and her aunt were out, that appellant called her into her mother's room, had her lie on the bed, and then touched her "private spot," but did not testify that appellant

---

[5] During the motion to suppress the sworn statement, SA RO testified that appellant was "under-average intelligence." During the court-martial, however, SA RO denied that he had previously stated that appellant was of under-average intelligence, instead, he considered appellant to be of "average intelligence."

penetrated her in any way. She also testified about another occasion where the touching occurred at appellant's home when she and MF were staying there while her mother was out of town and her father was deployed to Iraq. SF discussed a third occasion when appellant touched her at a local restaurant while several members of the family were eating dinner together, a scenario she had never disclosed before. When SF struggled to provide more details, the trial counsel requested permission from the military judge to refresh her recollection by showing her the video recording of the forensic interview. The military judge allowed the trial counsel to show SF the video after the court recessed for the evening.

The next day, SF took the stand again, and testified appellant had touched her by putting his finger inside her "private spot." During cross-examination, SF admitted that, in addition to reviewing the video of her forensic interview the night prior, she had spoken to her grandmother, Mrs. TG, about the touching. After denying defense's motion to strike SF's testimony, the civilian defense counsel continued to cross-examine SF and carefully and thoroughly elicited from SF the following information: that Mrs. TG was upset with appellant and Mrs. DF; that Mrs. TG was upset by the divorce between her son (SF's father) and Mrs. DF; and that Mrs. TG was worried about her son. The civilian defense counsel also highlighted the fact that SF told several other people that the touching never happened, and that she had spoken to her grandmother, Mrs. TG, many times about the incidents over the last two and one-half years.

MF also testified at the court-martial. Her testimony was mainly focused on an incident where she and the appellant were playing in the pool and she was wearing her bathing suit. She testified that he touched her vagina as she was exiting the pool, and the touching hurt. Unlike the testimony by SF, MF had difficulty providing any further details. Moreover, her description of the incident differed in almost every respect from that provided by appellant in his sworn statement, except for the fact that she was wearing a bathing suit. Finally, the civilian defense counsel gently, but clearly, confirmed MF had been living with her grandparents for quite some time, she was especially fond of her grandmother, Mrs. TG, she had told some people that the allegations regarding appellant never happened, and appellant used his left arm and left hand (which had been severely injured in Iraq and was not fully functional) to touch her.

## D. The Defense Strategy at Court-Martial

The focus of the defense case was that while appellant fully and voluntarily acknowledged his inappropriate sexual encounter with MW,[6] he never touched SF or MF inappropriately and those charges were based on the unfortunate combination of the influence of Mrs. TG on her granddaughters and a false confession. The defense focused on the fact that appellant readily admitted his sexual activity with MW during the CID interview, while initially denying the touching of the young girls. Furthermore, the defense argued that the long interview that went late into the night, appellant's severe injury to his shoulder, his PTSD, and his prescribed medications made appellant more vulnerable to CID's interrogation tactics. Finally, the defense repeatedly attacked the credibility of the statements made by SF and MF and attempted to demonstrate that the girls' grandmother had the motive and opportunity to influence the girls to make false statements against appellant.

Consistent with the defense theme, defense brought several pretrial motions, to include: a suppression motion, a motion for expert assistance, and a motion for an expert witness. The defense requested assistance from Dr. Christian Meissner, an associate professor of psychology and criminal justice at the University of Texas at El Paso. His expertise was psychology in the law, which he explained was the application of psychology to legal processes, legal decision-making, as well as the understanding of how humans interact with the legal system. In that area, Dr. Meissner focused on interrogations and confessions. Dr. Meissner taught classes on the subject of psychology in the law, published scholarly and peer-reviewed articles on the impact and efficacy of different interrogation techniques, served as an editor for academic journals relating to psychology in the law, served on the board for related professional organizations, was invited to present his scholarly work to members of his profession, received several awards for his research, previously served as an expert assistant, and testified as an expert in several courts-martial. The defense tendered him as an expert in interrogation and confessions, and the government did not object. The defense counsel asserted that the use of an expert assistant was vital to their understanding of whether appellant's statements to CID were voluntary, and to preparing a motion to suppress appellant's confession. The defense also requested that Dr. Meissner be authorized to testify as an expert witness.

The military judge denied the defense motions to compel production of an expert assistant and an expert witness. The military judge also denied the defense motion to suppress appellant's confession to CID. The military judge initially ruled from the bench, denying the defense motion to compel Dr. Meissner to serve as an

---

[6] However, despite the fact appellant did not disclose to CID that he received fellatio from MW, yet pleaded guilty to this conduct, the defense still argued that appellant was completely forthright during the interview.

expert assistant and an expert witness. The judge later included detailed, written findings and rulings for the record.

## II. LAW AND DISCUSSION

### A. Expert Assistance

We review a military judge's decision denying a request for expert assistance for an abuse of discretion. *United States v. Bresnahan*, 62 M.J. 137, 143 (C.A.A.F. 2005). "A military judge abuses his discretion when (1) the findings of fact upon which he predicates his ruling are not supported by the evidence of record; (2) if incorrect legal principles are used; or (3) if his application of the correct legal principles to the facts is clearly unreasonable." *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010) (citing *United States v. Mackie*, 66 M.J. 198, 199 (C.A.A.F. 2008)). A military judge's findings of fact are reviewed under a clearly erroneous standard. *United States v. Gore*, 60 M.J. 178, 187 (C.A.A.F. 2004). Moreover, "[w]hen judicial action is taken in a discretionary matter, such action cannot be set aside by a reviewing court unless it has a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon weighing of the relevant factors." *Id.* (quoting *United States v. Sanchez*, 65 M.J. 145, 148 (C.A.A.F. 2007) (quoting *United States v. Houser*, 36 M.J. 392, 397 (C.M.A. 1993))).

If the defense demonstrates that expert assistance is "relevant" and "necessary," then an expert can be employed at government expense to assist the defense. Rule for Courts-Martial 703(d). Our superior court has held that "'upon a proper showing of necessity, an accused is entitled to' expert assistance." *United States v. Ford*, 51 M.J. 445, 455 (C.A.A.F. 1999) (quoting *United States v. Burnette*, 29 M.J. 473, 475 (C.M.A. 1990)). "[N]ecessity requires more than the 'mere possibility of assistance from a requested expert.'" *Bresnahan*, 62 M.J. at 143 (quoting *United States v. Gunkle*, 55 M.J. 26, 31 (C.A.A.F. 2001)). "The accused must show that a reasonable probability exists 'both that an expert would be of assistance to the defense and that denial of expert assistance would result in a fundamentally unfair trial.'" *Id.* (quoting *Gunkle*, 55 M.J. at 31). In *United States v. Gonzalez*, the court provided a three part test that the defense must satisfy in order to obtain an expert assistant: (1) why the expert assistance is needed; (2) what the expert assistance accomplishes for the accused, and (3) why the defense counsel were unable to gather and present the evidence that the expert assistant would be able to develop. 39 M.J. 459, 461 (C.M.A. 1994).

In *Bresnahan*, the appellant requested an expert assistant to examine the coercive interrogation techniques used by a civilian detective in order to determine the reliability, rather than the voluntariness, of the appellant's resultant confession. In that case, appellant's three-month-old child was admitted to the hospital for

injuries consistent with "shaken baby syndrome." *Bresnahan*, 62 M.J. at 140. While the doctors were working to treat the child's injuries, a civilian police detective arrived and questioned the appellant. The detective first interviewed the appellant in the hospital and later at the police station. *Id.* She did not read him his *Miranda* rights warning. *See Miranda v. Arizona*, 384 U.S. 436 (1966). The detective told the appellant that his "child's injuries were so severe that he might not survive." *Bresnahan*, 62 M.J. at 140. She then pressed him for information, stating that in order to help the baby, doctors needed to know exactly what happened. *Id.* After continued questioning, the appellant admitted to the detective that he may have shaken the baby. *Id.* Following that admission, the appellant then told the treating physician that he may have shaken the baby, presumably in an effort to ensure appropriate medical treatment for the child. *Id.* In making their request for expert assistance to examine the appellant's statements, the defense never presented evidence to suggest that the appellant's confession was actually false. *Id*. at 143. Moreover, there was no evidence that the appellant suffered from any "abnormal mental or emotional problems," or possessed a "submissive personality" such that he would make false incriminatory statements. *Id.* The court in *Bresnahan* ultimately held that the military judge did not abuse his discretion when he denied the defense request for expert assistance. *Id.* at 143–44.

Like the appellant in *Bresnahan*, the appellant in this case never presented any evidence to suggest that his statements to SA RO were actually false.[7] Instead, the defense's written motion and oral argument focused on the voluntariness of appellant's statement to CID, not its reliability. The civilian defense counsel admitted the defense team needed the expert to help them determine if they may have a false confession issue, and they had not yet uncovered any evidence indicating that the confession was, in fact, false. The defense counsel did not provide any evidence that the appellant was unusually susceptible to coercion or had any abnormal mental or emotional problems that might make him more vulnerable to confessing falsely. The military judge found the defense could not articulate exactly what Dr. Meissner could do for the defense theory, and characterized the use of the expert as akin to a "fishing expedition." As such, the military judge found the defense could not satisfy the first two criteria set out in *Gonzalez*. For the third factor, the military judge found the civilian defense counsel had some background in the area of false confessions and had experience with the issue in other cases. The military judge also found the military defense counsel had not yet availed himself of any of the resources on false confessions, including a seminar conducted by Dr.

---

[7] While the defense did try to elicit testimony that SF was living out of state at the time appellant admitted to inappropriately touching her, thereby raising a factual impossibility, the evidence showed that SF was in El Paso with appellant during the disputed time-frame.

Meissner, which other members of the Fort Bliss trial defense office previously attended. The military defense counsel also had not conducted any research on his own, such as reviewing a published *Army Lawyer* article on the topic or the numerous studies provided by Dr. Meissner.

We conclude that the military judge was not clearly erroneous in his findings of fact, and he did not base his decision on an incorrect view of the law. *See Ellis*, 68 M.J. at 344. Therefore, we hold that the military judge did not abuse his discretion in denying the request for expert assistance in this case. The defense counsel failed to demonstrate necessity for the expert's assistance and did not adequately demonstrate why the defense team could not gather and present the evidence that the expert assistant would be able to develop. *See Gonzalez*, 39 M.J. at 461.

## B. Expert Testimony

As noted above, the defense also requested Dr. Meissner as an expert witness. The military judge denied this request as well. In so doing, appellant argues that the military judge abused his discretion. We agree that the military judge placed an undue emphasis on error rates such that Dr. Meissner's or any other false confession expert's testimony would be categorically unreliable. However, we conclude the military judge ultimately ruled correctly that even if the expert testimony was reliable, expert testimony was not necessary in this case to assist the panel members in evaluating the evidence or determining a fact in issue. Additionally, we agree with the judge's findings on the other factors, to include Military Rules of Evidence [hereinafter Mil. R. Evid.] 403.

In *United States v. Houser*, our superior court extrapolated six factors from the Military Rules of Evidence that a proponent must establish in order to have an expert testify. *Houser*, 36 M.J. at 397. The defense must show (1) "the qualifications of the expert, Mil. R. Evid. 702"; (2) "the subject matter of the expert testimony, Mil. R. Evid. 702"; (3) "the basis for the expert testimony, Mil. R. Evid. 703"; (4) "the legal relevance of the evidence, Mil. R. Evid. 401 and 402"; (5) "the reliability of the evidence, . . . Mil. R. Evid. 401"; and (6) "whether the 'probative value' of the testimony outweighs other considerations, Mil. R. Evid. 403." *Id.* (citing *Manual for Courts-Martial, United States* (1984 ed.), pt. III, Military Rules of Evidence).

The Supreme Court decided *United States v. Daubert*, 509 U.S. 579 (1993), two months after the holding in *Houser* was announced. In *Daubert*, the Court held that "Fed. R. Evid. 702 assigns to the trial judge the duty to act as a gatekeeper, *i.e.*, 'the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand.'" *Daubert*, 509 U.S. at 597, *quoted in United States v. Griffin*, 50 MJ. 278, 283–84 (C.A.A.F. 1999). To help determine whether

scientific evidence meets the requirements for reliability and relevance, the Supreme Court provided six factors to be considered by the judge: "(1) Whether the theory or technique 'can be (and has been) tested'; (2) Whether 'the theory or technique has been subjected to peer review and publication'; (3) The 'known or potential' error rate; (4) The 'existence and maintenance of standards controlling the technique's operation'; (5) The degree of acceptance within the 'relevant scientific community'; and (6) Whether the 'probative value' of the evidence 'is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury.'" *Griffin*, 50 MJ. at 284 (quoting *Daubert*, 509 U.S. at 593–95).

Our superior court subsequently held that "although *Houser* was decided before *Daubert*, the two decisions are consistent, with *Daubert* providing more detailed guidance on the fourth and fifth *Houser* prongs pertaining to relevance and reliability."[8] *Griffin*, 50 M.J. at 284. The court also noted that while *Daubert* focused on scientific evidence, it left open the "question of whether the same analysis applied to 'technical or other specialized knowledge.'" *Id.* (quoting *Daubert*, 509 U.S. at 590 n.8). The Supreme Court in *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), answered this question when it held that the trial judge's gatekeeping function applies to all types of expert testimony, even if it is characterized as "technical" or "other specialized knowledge," rather than "scientific knowledge." *Id.* at 141. The Court also held that the "trial court may consider one or more of the specific factors" that *Daubert* mentioned when doing so will help determine the testimony's reliability. *Id.* Furthermore, the Court noted that "the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether expert testimony is reliable." *Id*. at 152.

We review a military judge's decision regarding the admissibility of expert testimony pursuant to Mil. R. Evid. 702 for an abuse of discretion. *Griffin*, 50 M.J. at 284. The question of whether a trial judge properly followed the *Daubert* framework is reviewed de novo. *Id*. (citing *United States v. Hall*, 93 F.3d 1337,

---

[8] Following the decisions in *Daubert* and *Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999), and the subsequent amendment of Federal Rule of Evidence 702, Military Rule of Evidence 702 was amended to include three additional statutory requirements: (1) the testimony must be based upon sufficient facts or data; (2) the testimony must be the product of reliable principles and methods; and (3) the witness must have applied the principles and methods reliably to the facts of the case. *Manual for Courts-Martial, United States* (2008 ed.), pt. III, Military Rule of Evidence 702. These additional requirements provide "guidance for courts and parties as to the factors to consider in light of *Daubert* . . . and *Kumho Tire Co*. . . ." Mil. R. Evid. 702 analysis at A22-52. This amendment does not affect the continued vitality of the *Houser* framework. *See United States v. Sanchez*, 65 M.J. 145, 149–50 (C.A.A.F. 2007).

1342 (7th Cir. 1996)). "If the judge did so, we will not overturn the ruling unless it is 'manifestly erroneous.'" *Id.* (quoting *United States v. Thomas*, 49 M.J. 200, 202 (C.A.A.F. 1998)).

During the hearing on the motion, Dr. Meissner stated that if allowed to testify during the court-martial as an expert witness, he would limit his testimony to identifying risk factors that may make a person more susceptible to coercion and falsely confessing to a crime. He would not testify about the facts in the case. Dr. Meissner also stated that his testimony would be designed to provide the court with an understanding of the science of interrogations and confessions and would allow the court to be the fact finder with regard to the evidence before it. Dr. Meissner stated that he would not testify whether appellant's confession was actually false, thereby avoiding the problem of acting as a "human lie detector." *Griffin*, 50 M.J. at 284 (quoting *United States v. Birdsall*, 47 M.J. 404, 410 (C.A.A.F. 1998)) (internal quotation marks omitted).

Instead, Dr. Meissner stated that he would be prepared to testify as to situational factors and personal factors of appellant's interrogation. Situational factors may involve the specific interrogative approach or approaches that were used. They also may include the length of the interrogation or the time of day, and how those factors affect decision making. Dr. Meissner also discussed maximization and minimization techniques and how these interrogation methods might increase the chance of a false confession. Maximization techniques involve a variety of approaches that seek to increase one's perception of the strength of the evidence. In contrast, a minimization technique is designed to put the subject at ease and gain their trust by downplaying a suspect's perception of the consequences associated with a particular act or by minimizing the suspect's responsibility in the situation. Dr. Meissner testified that the use of these techniques in general increases the likelihood of false confessions, and the minimization techniques in particular doubles the likelihood of a false confession. Personal factors are focused on the person being interviewed, and why an individual might be more susceptible to interrogation and might be more suggestible or more susceptible to providing a false confession. These individual characteristics may include: intelligence or IQ; mental capacity; age; prior or current use of drugs or alcohol; and mental health concerns, such as prior diagnosis of depression, personality disorders, or anxiety disorders, heightening suggestibility and making one more vulnerable in the interrogation room.

Dr. Meissner explained his testimony would not be prepared for a specific case, but rather, would be based on scientific literature. When questioned about the reliability of his studies, and specifically about the error rate, Dr. Meissner discussed that for experimental studies, the standard hypothesis test probability must be less than five percent. He also admitted that the literature does not reflect, nor could it ever accurately reflect, the absolute rate of true confessions or false

confessions in real cases. Instead, he has to extrapolate from experimental studies, from self-reporting, from law enforcement surveys, and from studies that review cases of persons wrongfully convicted and later exonerated (through the use of DNA analysis, for example).[9] Dr. Meissner testified that given his expertise, he attempts to identify how a given situation increases the likelihood of an event occurring, and that every other science, both the hard sciences and the soft sciences, use the same practice for estimating the likelihood of events.

After 116 pages of testimony from Dr. Meissner, and 17 pages of argument from counsel, the military judge ruled that Dr. Meissner's testimony did not satisfy the *Daubert* or *Houser* factors. The military judge's findings reflected his concern with the reliability of Dr. Meissner's testimony. Specifically, the military judge found that Dr. Meissner's ability to reliably testify as to the factors consistent with a false or coerced confession would be dependent on theories and techniques that cannot be and have not been tested. Appellant argues the military judge erred by relying too heavily on the fact that a false confession expert cannot provide the actual rate of false confessions in real world criminal cases, and concluded in his written findings that "a fortiori, there cannot be any technique or theory designed to determine those facts." We concur with appellant's assertion that the military judge erred in this respect.

Indeed, if we take the military judge's analysis to its logical end, a false confession expert could never testify in a court-martial because there is no method to determine the known or potential error rates for such testimony. We conclude that while error rates can be an important component to help determine whether

---

[9] While Dr. Meissner testified that in his expert opinion, false confessions do exist, he could not answer the military judge's questions regarding the frequency of false confessions in the criminal justice system. For instance, one study co-authored by Dr. Meissner and on which he relied during his testimony, reflects that "while there has been a notable surge in the frequency of false confessions discussed in the media, the actual rate of false confessions in practice is difficult to determine." Different studies have shown that prisoners reported false confession rates between 12–24%, community samples reported incident rates between 1–14%, juvenile dependents reported having a false confession rate of 6%, and defendants with serious mental illnesses reported a false confession rate of 22%. While a survey of police investigators estimated that 5% of "innocent" suspects provide a false confession, the Innocence Project reported 25% of wrongful convictions in its sample of 215 cases included false confession evidence. *See* Christian A. Meissner, Allyson J. Horgan, & Justin S. Albrechtsen, *False Confessions*, *in* Applied Criminal Psychology; A Guide to Forensic Behavioral Sciences, pp. 191–212 (R. Kocsis' ed., 2009).

scientific evidence meets the requirements for reliability and relevance, undue reliance on this factor creates an analytical approach that will exclude virtually all expert testimony based on the social sciences. It is important to remember that while a "court should consider the specific *Daubert* factors where they are reasonable measures of reliability," *Kumho Tire Co.*, 526 U.S. at 138, each factor "neither necessarily nor exclusively applies to all experts in every case," *id.* at 141. The military judge compounded the error by taking the unusual step of judicially noticing the testimony of an expert in a separate case, *United States v. Griffin*, 50 M.J. 278, 282 (C.A.A.F. 1999), and an affidavit provided by the same expert in an unreported case, *United States v. Wilson*, NMCCA 200300734, 2007 WL 1701866 (N.M. Ct. Crim. App. 13 Feb. 2007), "both to the effect that the theory of false confessions has not reached scientific acceptability." As this information was from two older, unrelated cases, it is not particularly informative, and arguably irrelevant, because the degree of acceptance of a particular theory or technique can change over time. *See* Mil. R. Evid. 201.

Despite these errors, we conclude the military judge ultimately ruled correctly. As the military judge stated in his written ruling, assuming *arguendo* Dr. Meissner's testimony met the reliability requirements outlined in *Daubert* and *Houser*, the situational and personal factors that he would testify about were not so counterintuitive as to require expert testimony to assist the members in understanding the evidence or determining a fact in issue. Additionally, the military judge found that the probative value of the evidence was substantially outweighed by the potential to mislead the members, confusion of the issues, and considerations of undue delay and waste of time.

In this case, we agree with the military judge that neither the personal factors nor the situational factors presented were so counterintuitive as to require expert testimony. There is no evidence the appellant possessed personal factors that would make him more susceptible to coercive interrogation tactics. While the defense tried throughout the trial to demonstrate that their client was very vulnerable at the time of the CID interview, ultimately the evidence elicited did not support the theory that he had a submissive or overly compliant personality or was improperly influenced. *See also Griffin*, 50 M.J. 284–85 (finding that absent these factors, the expert testimony was of "little value in determining whether appellant was coerced to confess"). Appellant was injured in Iraq and was prescribed medications, but the defense was unable to show that he was taking the medications at the time of the interview, was in pain or displayed discomfort during the interview, or was under the influence of any substances. Likewise, the defense spent substantial time discussing appellant's mental state and chronic PTSD as well as his in-patient mental health treatment after the interview, but was unable to conclusively tie his conditions to his conduct during the questioning by CID. Instead, the evidence showed that appellant was an intelligent young man with a high GT score who was

not predisposed to being influenced by an investigator to admit to crimes he did not commit.

Moreover, there were very few situational factors in this case that lend support to the defense's claims that the interrogation environment was so coercive as to create a climate where a false confession would be likely. Distinct from the police detective in *Bresnahan*, SA RO did not knowingly create a stressful interrogative atmosphere. Where the detective in *Bresnahan* used the very real life-and-death situation of appellant's infant child as leverage to elicit a confession, here, SA RO was unaware of any facts or circumstances, such as appellant's anticipated medical discharge from the Army within twenty-four hours, which he might use as leverage to elicit an admission. There is no indication that he pressured appellant or used the type of techniques Dr. Meissner spoke of in his testimony. While SA RO did tell appellant that the girls were too young to fabricate the accusations (when in fact, SA RO knew very little about the girls or other details of the case), there is no other evidence that he exaggerated the government's case, took advantage of appellant's physical limitations, or used other so called maximization techniques in an attempt to force appellant to admit to the offenses. There was no evidence to suggest that SA RO attempted to minimize appellant's culpability or the potential consequences of his actions. In fact, there was substantial evidence SA RO was a relatively inexperienced agent who knew very little about the case and who did not attempt to employ sophisticated techniques to elicit a confession. Instead, SA RO slowly and deliberately discussed the allegations with appellant during which time appellant provided facts and circumstances surrounding the touching of SF and MF, facts and circumstances of which SA RO was previously unaware. The interview was very long and did continue late into the night and the early morning hours, and these facts were highlighted repeatedly by the defense during cross-examination of SA RO and argued during closing argument. However, there is also clear testimony that SA RO offered the appellant breaks, food, and water throughout the interview process.

Therefore, we find the military judge did not abuse his discretion when he ruled that even if Dr. Meissner's testimony was reliable, neither the personal factors nor the situational factors presented in this case were so counterintuitive as to require expert testimony. Moreover, the judge's findings, coupled with the expert's proferred testimony, and the relative strength of the evidence, do not lead us to "'a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon weighing of the relevant factors.'" *Ellis*, 68 M.J. at 344 (quoting *Sanchez*, 65 M.J. at 148 (quoting *Houser*, 36 M.J. at 397)). In reaching this conclusion, we note that military practice does not prohibit the use of a false confession expert in courts-martial. Indeed, we can envision many different scenarios where expert testimony regarding false confessions would be helpful to the fact finder. *See, e.g.*, *United States v. Shay*, 57 F.3d 126 (1st Cir. 1995) (finding the trial court erred by excluding expert testimony regarding

15

defendant's mental disorder that caused him to tell grandiose, self-incriminating lies). We are also sensitive to the fact that without an expert witness, "the defense was compelled to rely on arguments by counsel drawing inferences from lay testimony without the benefit . . ." of expert testimony to educate the panel in the study of false confessions. *United States v. Lloyd*, 69 M.J. 95, 103 (C.A.A.F. 2010) (Effron, CJ., dissenting). However, as gatekeepers, military judges are in the best position to make the determination as to whether an expert should testify given the particular facts of a case. *Daubert*, 509 U.S. at 593–93; *Houser*, 36 M.J. at 397. We agree with the military judge's conclusion that the facts presented here were simply not of a nature where members would have difficulty discerning the voluntariness or reliability of appellant's confession.

## C.  Admission of SF's Prior, Consistent Statements

Appellant also alleges that the military judge abused his discretion by allowing testimony about SF's prior consistent statements. At trial, the military judge admitted testimony from Mrs. TG, testimony from SGT RF, and portions of the forensic interview conducted by Ms. KC, all of which relate to SF's description of appellant's conduct with her. The defense argued that this information should not be admitted because these statements came after Mrs. TG improperly influenced SF to make incriminating statements about appellant, and were therefore not prior consistent statements within the meaning of Mil. R. Evid. 801(d)(1)(B). The government argued that there was no evidence that Mrs. TG improperly influenced SF until the evening before SF's second day of testimony. Thus, the timing of the alleged influence is of paramount importance to resolving the issue presented in this case.

Hearsay is defined as "an out-of-court statement made by a declarant that is 'offered in evidence to prove the truth of the matter asserted' in that statement." Mil. R. Evid. 801(c). Generally, such evidence is inadmissible unless it meets "at least one of the specific and time-tested exceptions" to the prohibition against hearsay, *United States v. Adams*, 63 M.J. 691, 696 (Army Ct. Crim. App. 2006) (quoting *United States v. McCaskey*, 30 M.J. 188, 190–91 (C.M.A. 1990)), or falls within one of the categories of out-of-court statements defined as "not hearsay." Mil. R. Evid. 801(d).[10]

---

[10] "According to Mil. R. Evid. 801(d), two categories of out-of-court statements, prior statements by a witness and admissions by a party-opponent, are 'not hearsay,' provided certain conditions are met. One such instance is where '[t]he declarant [of the prior statement] testifies at the trial[,] . . . is subject to cross-examination concerning the statement, and the statement is . . . consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant

(continued . . .)

Under Mil. R. Evid. 801(d)(1)(B), a prior consistent statement of a witness is "not hearsay. . . if offered to rebut an express or implied charge of *recent fabrication or improper influence or motive*."[11]  *United States v. Allison*, 49 M.J. 54, 57 (C.A.A.F. 1998) (emphasis added).  "Under the rule [prior consistent statements] are substantive evidence."  *Tome v. United States*, 513 U.S. 150, 161 (1995) (quoting Fed. R. Evid. 801(d)(1)(B) advisory committee's note).  Military Rule of Evidence 801(d)(1)(B) contains several "inherent safeguards" that must be satisfied before prior statements will be admitted.  *United States* v. *Hood*, 48 M.J. 928, 933 (Army Ct. Crim. App. 1998) (citing *McCaskey*, 30 M.J. at 191).  "The rule's predicate safeguards are that the declarant must testify at trial and be subject to cross-examination; the statement must be consistent with the declarant's in-court testimony; and, the statement must be offered to actually rebut an attack of recent fabrication or improper motive or influence."  *Id.*

We review a military judge's decision to admit or exclude evidence of a prior consistent statement for an abuse of discretion.  *United States v. Springer*, 58 M.J. 164, 167 (C.A.A.F. 2003).  Appellant asserts that Mrs. TG formed an immediate motive to influence the testimony of her granddaughters upon discovery of the affair between appellant and Mrs. DF.  As such, appellant argues that SF's prior statements did not precede Mrs. TG's improper influence, and therefore, the statements were not prior consistent statements admissible under the rule.  In support of this theory, appellant argues that by the summer of 2007, the family members knew of the affair between appellant and Mrs. DF, and therefore Mrs. TG's motive arose several

---

(. . . continued)
of recent fabrication or improper influence or motive.'  Mil. R. Evid. 801(d)(1)(B). Because a statement meeting these conditions is 'not hearsay,' it may be admitted to prove the truth of the matter it asserts."  *Adams*, 63 M.J. at 696 n.2 (alterations in original).

[11] "Although the rule appears to propose two different types of charges as challenges to the credibility of a witness, most courts have interpreted these phrases as complimentary and have used them interchangeably, even sometimes inconsistently. . . . The courts have not distinguished between 'improper motive' and 'recent fabrication' as anything other than describing a charge of intentional falsification as a result of an improper motive. . . . Whether the falsification must have come as a result of a motive which was not present when the consistent statement was made is dependent only on whether the time-line analysis applies, not on whether recent fabrication is a separate charge."  Ohlbaum, *The Hobgoblin of the Federal Rules of Evidence:  An Analysis of Rule 801(d)(1)(B), Prior Consistent Statements and a New Proposal*, 1987 B.Y.U. L. Rev. 231, 246 (internal citations omitted).

months before the initial report of appellant's conduct with SF and MF in late October or early November of 2007. However, the defense presented no direct evidence that supports that theory. *See Hood*, 48 M.J. at 932. During trial, the defense pressed Mrs. TG as well as SF about Mrs. TG's unhappiness with her daughter-in-law's relationship with appellant; however, there were no facts elicited to demonstrate that Mrs. TG's unhappiness with her daughter-in-law translated into *improper* influence on her granddaughters to make false, incriminating statements against appellant. This was not a case of disputed child custody, in fact, Mrs. TG and Mrs. DF agreed that the children would live with their grandmother until their father returned from Iraq. Arguably, the defense did elicit testimony that Mrs. TG had motive and opportunity to make false allegations herself. The defense certainly elicited testimony that Mrs. TG, as the primary care provider during a very difficult time had the ability to influence her granddaughters. The defense also elicited testimony that the girls' description of the events involving appellant was, at times, inconsistent over the two and one-half years between the initial report and the time of trial. Inconsistency, however, does not necessarily equate to evidence that warrants consideration under the rule. *See, e.g.*, *Christmas v. Sanders*, 759 F.2d 1284, 1288–89 (7th Cir. 1985) (noting consistent equivocation is not necessarily "recent fabrication"); *United States v. Nelson*, 735 F.2d 1070, 1072 (8th Cir. 1984) (noting "differing explanations on prior occasions" differs from recent fabrication). Beyond mere conjecture, the defense did not proffer any evidence that Mrs. TG improperly influenced the girls to make false accusations against appellant at any time before trial. Because the improper influence asserted by appellant amounts to nothing more than speculation, under the circumstances, the statements at issue remain within the ambit of Mil. R. Evid. 801(d)(1)(B). *See Hood*, 48 M.J. at 932.

Here, the only evidence establishing an improper influence involved Mrs. TG's actions following SF's first day of testimony at appellant's court-martial. On her first day of testimony, SF testified to inappropriate touching by appellant, but she did not provide any details to support the digital penetration as alleged in the indecent acts specification. After SF finished her first day of testimony, in addition to reviewing the recording of her forensic interview, she spoke with Mrs. TG about the allegations. The next morning, SF testified in more detail and provided damaging testimony that included information about the digital penetration. At that point, the defense counsel elicited information that Mrs. TG spoke with SF the night prior and potentially improperly influenced her testimony.

All the prerequisites of Mil. R. Evid. 801(d)(1)(B) were met in this case before the military judge allowed the prior statements into evidence. SF testified over two days and was cross-examined extensively by the defense. Her prior statements were consistent with her in-court testimony, and the prior consistent statements were offered to rebut an attack of improper influence raised by the defense that Mrs. TG improperly influenced SF's second day of testimony. Although the defense attempted to portray the conversation between Mrs. TG and SF

as one more piece of evidence that demonstrated the continuing improper influence by the grandmother, the military judge found that the defense offered prior inconsistent statements "to show that the witness is blowing hot and cold. That they said something on a prior occasion that they didn't say today," which does not, by itself, rise to the level of recent fabrication envisioned by Mil. R. Evid. 801(d)(1)(B). "Prior consistent statements may not be admitted to counter all forms of impeachment or to bolster the witness merely because she has been discredited." *Tome*, 513 U.S. at 157. It was not until the defense cross-examined SF about her conversation with Mrs. TG and its impact on SF's in-court testimony that the military judge found the defense unwittingly opened the door to all the prior consistent statements made by SF after the initial report of misconduct. We conclude that the military judge properly found that the prior statements predated the alleged improper influence, and that the prior statements rebutted the allegation of improper influence. *See Allison*, 49 M.J. at 57.

Finally, even if the military judge erred in admitting the statements, we find no error that materially prejudiced appellant's substantial rights. UCMJ art. 59(a); *McCaskey*, 30 M.J. at 193. Appellant's confession regarding his conduct with SF was very damaging in its details—from the location of the touching, to what SF was wearing, to how she reacted, to how he touched her, and what she felt like. Appellant's detailed and specific confession provided powerful, corroborating evidence that was independent of Ms. SF's out-of-court statements to her grandmother, her father, and to Ms. KC. Furthermore, although SF had difficulty describing the details of the touching by appellant, she did ultimately provide sufficient information that substantially matched appellant's description of the incident. Additionally, the panel was also authorized to consider the offenses involving MW for its tendency to show appellant's propensity or predisposition to engage in child molestation, as well as its tendency to prove that appellant intended to gratify his lust and sexual desires through the charged actions against SF and MF. *See* Mil. R. Evid. 414. In short, the evidence against appellant, without regard to the prior statements, was overwhelming.

### D. Failure to Allege Terminal Elements for Article 134 Offense

In Specification 1 of Charge II, appellant was charged with indecent acts with a child under the then-existing provision of Article 134, UCMJ. *See Manual for Courts-Martial, United States*, (2002 ed.) [hereinafter *MCM*, 2002], pt. IV, ¶ 87.b., *deleted by* Exec. Order No. 13447, 72 Fed. Reg. 56179 (Sep. 28, 2007). The specification fails to allege the terminal elements of prejudice to good order and discipline or service-discrediting conduct. Pursuant to *United States v. Fosler*, 70 M.J. 225 (C.A.A.F. 2011), *United States v. Ballan*, 71 M.J. 28 (C.A.A.F. 2012), and *United States v. Humphries*, 71 M.J. 209 (C.A.A.F. 2012), it was error to omit the terminal elements from this specification.

Under the totality of the circumstances in this case, we conclude that the omission of the terminal elements from the indecent acts specification materially prejudiced appellant's substantial right to notice. UCMJ art. 59(a); *Humphries*, 71 M.J. at 215 ( relief warranted upon a showing that "the Government's error in failing to plead the terminal element of Article 134, UCMJ, resulted in material prejudice to [appellant's] substantial right to notice."). There is nothing in the record to satisfactorily establish notice of the need to defend against a terminal element and the evidence was controverted as to at least one clause of Article 134, UCMJ. *See Humphries*, 71 M.J. at 215–16 (holding that to assess prejudice, "we look to the record to determine whether notice of the missing element is somewhere extant in the trial record, or whether the element is 'essentially uncontroverted'" (citing *United States v. Cotton*, 535 U.S. 625, 633 (2002); *Johnson v. United States*, 520 U.S. 461, 470 (1997))). Although we cannot affirm a finding of guilty for indecent acts with a child, we may "affirm, instead, so much of the finding as includes a lesser included offense." UCMJ art. 59(b). *See United States v. King*, 71 M.J. 50 (C.A.A.F. 2012).

"The Constitution requires that an accused be on notice as to the offense that must be defended against, and that only lesser-included offenses that meet these notice requirements may be affirmed by an appellate court." *United States v. Miller*, 67 M.J. 385, 388 (C.A.A.F. 2009). "Article 79, UCMJ . . . is consonant with these constitutional principles, and applies at both the trial and appellate levels." *Id.* Article 79, UCMJ, defines a lesser-included offense as an offense that is "necessarily included in the offense charged or of an attempt to commit either the offense charged or an offense necessarily included therein." Whether one offense is necessarily included in another is determined by application of the elements test. *Schmuck v. United States*, 489 U.S. 705, 716 (1989); *United States v. Jones¸* 68 M.J. 465, 468 (C.A.A.F. 2010). "Under the elements test, one compares the elements of each offense." *Jones¸* 68 M.J. at 470. In making this comparison, "[t]he elements test does not require that the two offenses at issue employ identical statutory language. Instead, the meaning of the offenses is ascertained by applying the 'normal principles of statutory construction.'" *United States v. Alston*, 69 M.J. 214, 216 (C.A.A.F. 2010) (quoting *Carter v. United States*, 530 U.S. 255, 263 (2000)).

The indecent acts specification at issue alleged that appellant did "commit an indecent act upon the body of [SF], a female under 16 years of age, not the wife of [appellant], by digitally penetrating the vagina of [SF] and rubbing his fingers on her vagina, with the intent to arouse and gratify the lust and sexual desires of [appellant]." Thus, the elements of this offense, a violation of Article 134, UCMJ, are: (1) that appellant digitally penetrated and rubbed SF's vagina, (2) that SF was under sixteen and not appellant's spouse, (3) that the acts appellant performed upon SF were indecent, (4) that appellant committed these acts to gratify his own lust and sexual desires, and (5) that appellant's conduct "was to the prejudice of good order and discipline in the armed forces or was of a nature to bring discredit upon the

armed forces." *See MCM* 2002, pt. IV, ¶ 87.b. The elements of battery upon a child under the age of sixteen in violation of Article 128, UCMJ, are: (1) bodily harm, (2) with unlawful force or violence, (3) upon a child under the age of sixteen years. *MCM* 2002, pt. IV, ¶ 54.b.

In this case, we conclude that the elements of assault consummated by a battery upon a child are necessarily included in the elements of indecent acts with a child. *Cf. United States v. Bonner*, 70 M.J. 1, 3 (C.A.A.F. 2011) (citing *United States v. Johnson*, 54 M.J. 67, 69 (C.A.A.F. 2000)).[12] Furthermore, the elements of that offense are supported by the evidence admitted at trial, and therefore, a finding of guilty to the lesser-included offense is both factually and legally sufficient. Accordingly, regarding the indecent acts with a child specification, we affirm appellant's conviction for the lesser-included offense of assault consummated by a battery upon a child in violation of Article 128, UCMJ.

In affirming this lesser offense, we conclude that reassessment without rehearing is possible—we are confident "that, absent any error, the sentence adjudged would have been of at least a certain severity." *United States v. Sales*, 22 M.J. 305, 308 (C.M.A. 1986). In this case, the penalty landscape is minimally changed. By affirming the lesser-included offense of assault consummated by a battery upon a child, the maximum possible confinement changes from twenty-seven years to twenty-two years, thereby reducing but not dramatically altering the penalty landscape. Furthermore, this court is experienced and familiar with cases involving the offenses of which appellant was convicted. In performing our reassessment, we conclude that a five-year reduction in appellant's sentence to confinement is appropriate. In light of the remaining charges and their serious nature, we are confident the court would have adjudged a sentence of at least a dishonable discharge, nineteen years and six months of confinement, forfeiture of all pay and allowances, and reduction to the grade of E-1.

### III. CONCLUSION

On consideration of the entire record, the assigned errors, the allegations raised by appellant pursuant to *United States v. Grostefon*, the briefs submitted by the parties, and the oral arguments by both parties, and in light of *United States v.*

---

[12] It is informative to note that during trial, the defense argued, and the military judge agreed, that assault consummated by a battery was a lesser-included offense of indecent acts and the panel was instructed accordingly. Additionally, while not controlling, assault consummated by a battery is listed in the Manual for Courts-Martial as a lesser-included offense of indecent acts, *MCM* 2002, pt. IV, ¶ 87.d. *See Miller*, 67 M.J. at 388 n.5.

BELL—ARMY 20100266

*Humphries*, 71 M.J. 209 (C.A.A.F. 2012), the finding of guilty for Specification 1 of Charge II, indecent acts or liberties with a child, is set aside, and a finding of guilty of the lesser-included offense of assault consumated by battery upon a child under the age of sixteen years for that specification is AFFIRMED. The remaining findings of guilty are AFFIRMED. Reassessing the sentence on the basis of the error noted, the entire record, and in accordance with the principles of *Sales* and *United States v. Moffeit*, 63 M.J. 40 (C.A.A.F. 2006), to include the factors identified by Judge Baker in his concurring opinion in *Moffeit*, only so much of the sentence as provides for a dishonorable discharge, nineteen years and six months of confinement, forfeiture of all pay and allowances, and reduction to the grade of E-1 is AFFIRMED. All rights, privileges, and property, of which appellant has been deprived by virtue of that portion of his sentence set aside by this decision, are ordered restored. *See* UCMJ arts. 58b(c) and 75(a).

Senior Judge KERN and Judge ALDYKIEWICZ concur.

FOR THE COURT:

MALCOLM H. SQUIRES, JR.
Clerk of Court

22