# UNITED STATES NAVY–MARINE CORPS COURT OF CRIMINAL APPEALS

———————————————

No. 201700190

———————————————

## UNITED STATES OF AMERICA
*Appellee*

v.

## Peter A. SALAS III
Lance Corporal (E-3), U.S. Marine Corps
*Appellant*

———————————————

Appeal from the United States Navy-Marine Corps Trial Judiciary

*Military Judges:*
Major Michael Zimmerman, USMC (*arraignment*);
Lieutenant Colonel Brian Kasprzyk, USMC (*Article 39(a)*);
Colonel Matthew Kent, USMC (*Article 39(a)*);
Major Mark Sameit (*trial*).

*For Appellant:* Robert A. Feldmeier, Esq.;
Captain Andrew House, JAGC, USN.

*For Appellee:* Lieutenant Allyson L. Breech, JAGC, USN;
Lieutenant Megan P. Marinos, JAGC, USN.

———————————————

Decided 3 December 2018

———————————————

Before WOODARD, FULTON, and CRISFIELD,
*Appellate Military Judges*

———————————————

**This opinion does not serve as binding precedent but may be cited as persuasive authority under NMCCA Rule of Practice and Procedure 18.2.**

———————————————

WOODARD, Chief Judge:

A panel comprised of officer and enlisted members sitting as a general court-martial convicted the appellant, contrary to his pleas, of rape in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920 (2016).[1] The members sentenced the appellant to four years' confinement, reduction to pay grade E-1, and a dishonorable discharge. Except for the dishonorable discharge, the sentence was ordered executed.

The appellant raises the following four assignments of error: (1) his trial defense team was ineffective for failing to timely raise a motion to compel expert assistance; (2) his trial defense team was ineffective for failing to raise a motion to suppress his recorded statements to a confidential informant;[2] (3) the military judge abused his discretion by denying—as untimely and without good cause—his motion to compel an expert consultant; and (4) his conviction was factually insufficient. Although not raised as error, we note that the Staff Judge Advocate's Recommendation (SJAR) recommends,[3] and the promulgating order approves and orders executed, a sentence which includes total forfeitures. The sentence adjudged by the court-martial did not include forfeitures. We order corrective action in our decretal paragraph. After taking this corrective action, we are convinced that the findings and sentence are correct in law and fact and find no error materially prejudicial to the substantial rights of the appellant. Arts. 59(a) and 66(c), UCMJ.

## I. BACKGROUND

The appellant and JW shared a short but significant history. They met as high school seniors in Texas, worked part-time together until graduation, and developed a sexual relationship. After graduating high school in 2015, JW started college and the appellant joined the Marine Corps. Upon graduating boot camp and completing his occupational specialty training, the appellant was stationed at Marine Corps Recruit Depot, San Diego,

---

[1] The appellant was acquitted of two specifications of sexual assault in violation of Article 120(b)(1)(B), UCMJ. One of these specifications involved JW (the victim of the offense now under review), and the other specification involved a separate alleged victim (OL).

[2] This assignment of error is raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982).

[3] In the SJAR, the staff judge advocate states that he has reviewed the report of results of trial, attached to the SJAR as enclosure (1), and it accurately reflects the sentence adjudged in the case. However, the report of results of trial attached to the SJAR reflects a sentence that includes reduction to pay grade E-1, confinement for four years, total forfeitures, and a dishonorable discharge. SJAR of 19 April 2017 at 1; Report of Results of Trial of 16 February 2017 at 2.

California, on 22 March 2016. Although they were separated geographically, the appellant and JW's relationship deepened. As described by JW at trial, the relationship became very serious—they were sexually active, were planning to get married, and she planned to move to San Diego and attend college there so that she could be near the appellant.

When the appellant was scheduled to be promoted to Lance Corporal (LCpl) on 1 May 2016, JW traveled to California to attend the ceremony and look for a job in the area. For her stay in California, JW rented an "Airbnb."[4]

The day following the appellant's promotion he was going through the text messages on JW's cellphone and became convinced that JW was cheating on him. JW testified that when the appellant confronted her about the messages and threatened to end their relationship, she told the appellant that she was not cheating on him, he had misunderstood the messages, and that she would do anything to regain his trust. In response, JW said that the appellant pointedly and repeatedly looked at his crotch, which she understood as an implied demand that she had to give him oral sex. Although she testified that she told the appellant she did not want to perform oral sex, that it wouldn't "prove anything to him,"[5] and tried to stop, the appellant pushed her head down to make her comply. She further recounted that she thought at the time that oral sex was the only way to convince him to stay. After the appellant ejaculated, they went to bed. Despite this incident, JW testified that she still wanted to remain in a relationship with the appellant.[6]

The next day, while the appellant was at work, although not admitting that she had cheated on him, JW wrote the appellant a letter apologizing for hurting him. When the appellant returned from work to the Airbnb, JW gave him the letter and the appellant just threw it aside. JW then testified that the next thing she remembered, she was on the bed on her stomach with the appellant pinning her to the bed so that she could not move—raping her. She further testified that she told him "stop" and "no" in a loud voice multiple times.[7] She recounted that the appellant responded, "You know this isn't rape, right?"[8] At some point the appellant shifted his weight and JW escaped to the bathroom crying. When she came out of the bathroom, she saw that the appellant was

---

[4] "Airbnb" is an application based service where home or apartment owners can temporarily sublease their property to travelers for a predetermined price.

[5] Record at 345.

[6] The appellant was acquitted of sexual assault for this incident.

[7] Record at 350.

[8] *Id.*

dressed and preparing to leave. She then pulled off his shirt and they had consensual sex. The next day the appellant ended their relationship, and JW flew home early to Texas.

Although JW did not report these incidents to law enforcement, shortly after arriving back in Texas she did inform the appellant's cousin Ms. M, her cousin Ms. D, and her Aunt E about her rape and alleged sexual assault. At trial, JW testified that she did not report the events to law enforcement because "it took me a long time to figure out what to call it, and I still loved him . . . and didn't want to hurt his career . . . and I didn't think anyone would even believe me."[9] JW did not discuss the incidents with law enforcement until an investigator from the Naval Criminal Investigative Service (NCIS) contacted her. This in turn did not occur until two other individuals contacted NCIS regarding the appellant. The first was the appellant's friend and former roommate, LCpl JM, and the second was another alleged victim, OL.

On 15 August 2016, LCpl JM reported to NCIS that, while having a conversation with the appellant about a call that the appellant had received from JW, the appellant told him that he had raped JW. LCpl JM did not know JW and had only seen her at the appellant's promotion ceremony. In recounting the details of the phone conversation to NCIS, LCpl JM stated that the appellant told him JW had threatened to report him to his command for raping her if he did not take her back.[10] When JM asked the appellant if he was "for real," the appellant responded that he was.[11]

Based on LCpl JM's report, NCIS opened an investigation. Initially, NCIS intended to just contact JW to see if she would cooperate with the investigation. However, before NCIS could contact JW about the allegation, a second victim, OL, came forward with additional allegations of sexual assault against the appellant. This prompted NCIS to seek to use LCpl JM as a confidential informant in an attempt to elicit admissions from the appellant.

LCpl JM agreed to act as a confidential informant and meet with the appellant while wearing a concealed recording device. During the recorded conversation, the appellant discussed the two incidents involving JW and made several incriminating statements. At the conclusion of the conversation, the appellant was taken into custody by NCIS. Two days later, NCIS

---

[9] *Id.* at 353. JW also testified she believed people would not believe "your boyfriend can even rape you" and the fact "he had told me it wasn't rape" influenced her decision to not report the incidents. *Id.*

[10] At trial, JW denied ever making such a threat. *Id.* at 386.

[11] *Id.* at 484-85.

contacted JW for the first time. When interviewed by NCIS, JW provided a statement detailing how the appellant raped her.

Additional facts necessary to the resolution of the assignments of error are included below.

## II. DISCUSSION

### A. Ineffective assistance of counsel

The appellant avers that he was denied effective assistance of counsel because his trial defense team failed to timely file a motion to compel the production of an expert consultant and failed to file a motion to suppress the unwarned recorded statements of the appellant to LCpl JM. We disagree.

We review claims of ineffective assistance *de novo. United States v. Akbar*, 74 M.J. 364, 379 (C.A.A.F. 2015). The appellant bears the burden of showing: (1) the defense team's performance was deficient; and (2) there is a reasonable probability that the deficient performance prejudiced the appellant at trial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). There is a "strong presumption that counsel's conduct falls within the wide range of reasonable assistance" *Id.* at 689. Since counsel are presumed competent, the appellant must rebut this presumption by showing specific errors that were unreasonable under prevailing professional norms. *United States v. Scott*, 24 M.J. 186, 188 (C.M.A. 1987) (citing *United States v. Cronic,* 466 U.S. 648, 104 (1984)).

"[W]hen a claim of ineffective assistance of counsel is premised on counsel's failure to make a motion, . . . an appellant must show that there is a reasonable probability that such a motion would have been meritorious." *United States v. Jameson*, 65 M.J. 160, 163-64 (C.A.A.F. 2007) (quoting *United States v. McConnell*, 55 M.J. 479, 482 (C.A.A.F 2001) (motion to suppress evidence)). In this regard, the term "meritorious" is synonymous with "successful." *Jameson,* 65 M.J. at 164. "[T]he decisional issue is whether [a]ppellant has carried his burden to show that his counsel would have been successful if he filed a timely motion." *Id.*

If we determine that appellant's counsel were deficient by failing to timely file an otherwise meritorious motion, we then test for prejudice. The appropriate test for prejudice is whether "there is a reasonable probability that, but for counsel's [deficiency], the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

To determine whether there is a reasonable probability that a motion to compel the production of expert assistance or a motion to suppress the appellant's unwarned recorded statements to LCpl JM would have been successful, it is necessary that we consider the merits of these issues.

*1. Motion to compel production of expert assistance*

The defense is entitled to an expert's assistance upon demonstration of necessity and a showing that "denial of expert assistance would result in a fundamentally unfair trial." *United States v. Bresnahan*, 62 M.J. 137, 143 (C.A.A.F. 2005) (citations omitted). However, necessity is more than the "mere possibility of assistance from a requested expert." *United States v. Gunkle*, 55 M.J. 26, 31 (C.A.A.F. 2001) (citation omitted). The appellant must prevail on both prongs by a "reasonable probability." *Bresnahan*, 62 M.J. at 143. Reasonable probability is something more than the stated desire to explore all possibilities, rule out non-specific theories, or the mere possibility of assistance. *Id.*

The "necessity" standard has a three-part test under which the appellant "must show: (1) why the expert assistance is needed; (2) what the expert assistance would accomplish for the [appellant]; and (3) why the defense counsel were unable to gather and present the evidence that the expert assistance would be able to develop." *Id.* (citations omitted).

a. Additional background facts

At the appellant's arraignment on 15 November 2016, the appellant reserved entering his pleas until a later date. The military judge then entered a trial management order (TMO) setting trial milestones in the case, to which the appellant agreed. Included in these milestones were the deadlines for the filing of expert assistance requests, the filing of motions, and the written entry of pleas and forum. In accordance with the TMO, all expert assistance requests were to be made not later than 23 November 2016 with the government's response to those requests due not later than 1 December 2016. All motions were to be filed not later than 5 December 2016. Additionally, a deadline of 9 January 2017 was set for the submission of written notice of pleas and forum. Despite the dates set in the TMO, the appellant did not submit a request for expert assistance to the convening authority until 28 November 2016. Although the record does not reflect when it was denied, we assume that the request was denied before 9 January 2017.

On 9 January 2017, the appellant's counsel requested an unscheduled Article 39(a), UCMJ, session in order to address a MILITARY RULE OF EVIDENCE (MIL. R. EVID.) 412, MANUAL FOR COURTS-MARTIAL, UNITED STATES (2016 ed.) issue. The court agreed and set the date of 18 January 2018 to hear the MIL. R. EVID. 412 issue. However, in addition to filing a MIL. R. EVID. 412 motion, the appellant also filed a motion to exclude evidence pursuant to MIL. R. EVID. 404(b), and a motion to compel production of an expert assistant. The appellant also entered his written pleas and election of forum on the same date.

On the morning of 18 January 2017, prior to the Article 39(a), UCMJ, session, the military judge informed counsel that although he would consider the

MIL. R. EVID. 412 and 404(b) motions, absent good cause for the late filing, he would not be considering the motion to compel expert assistance. During the Article 39(a), UCMJ, session, the appellant's counsel articulated his reasoning for the late filing. The military judge determined that counsel had not shown good cause for the late filing and declined to hear the untimely motion.

b. Analysis

Although the military judge did not consider the merits of the motion to compel production of expert assistance on the record, the record does contain the appellant's written motion and the government's written response. The record also contains the complete record of a related sealed proceeding wherein the appellant's counsel sought to explore, at trial, a prior sexual trauma alleged to have been suffered by JW. The record as a whole provides us sufficient detail to evaluate the merits of the motion to compel production of expert assistance.

The motion to compel production of expert assistance explains why the defense believed expert assistance was needed, what the defense expected the expert would accomplish, why counsel believed they were unable to gather and present the "information" they believed the expert would develop,the evidence that the trial defense team intended to offer at the motions hearing, and their argument in support of the motion. We note the motion also states that the only evidence to be offered in support of the motion was the appellant's request submitted to the convening authority for the employment of an expert forensic psychologist which was substantially the same as the motion. The appellant's request to the convening authority was attached to the motion and thus a part of the record.

In the written motion, the appellant's counsel argued that an expert was needed because they believed, based upon JW's prior statements to NCIS and her testimony during the Article 32, UCMJ, preliminary hearing, that JW experienced sexual trauma as a junior in high school when her youth pastor solicited her on-line.[12] They argued this prior sexual trauma "continued to have an impact on her," and that this "prior sexual trauma ha[d] caused [JW] to misinterpret and misremember what happened between her and the [appellant]."[13] If the expert assistance was granted, the trial defense team stated that they would consult with the expert "in order to determine how [the prior sexual trauma] affect[ed] her memory, competency, bias, and motive to misrepresent in order to develop impeachment evidence."[14] As the appellant's singular stated basis for the need of expert assistance was that JW was then under some

---

[12] The record is absent of any information related to the substance of the youth pastor's on-line comments to JW.

[13] AE XVIII at 3.

[14] *Id.* at 3.

sort of enduring psychological impact from the incident involving her youth pastor, in order for this court to be satisfied that the first prong of the "necessity" standard has been met, we must be satisfied that there is a reasonable probability the incident resulted in enduring psychological impact to JW.

The question of whether JW suffered some sort of enduring psychological injury from the incident involving her youth pastor was answered in the related MIL. R. EVID. 412 motion proceeding. Based upon our review of the record of that proceeding during which JW testified that she did not know if the incident has caused her any enduring psychological issues,[15] we, like the military judge, find "there [is] no evidence . . . that [the on-line solicitation of JW by her youth pastor] affected her any way other than the fact that she had been through the [legal] process before."[16]

Having found there was no evidence to support that JW was suffering from some sort of enduring psychological impact from the incident with her youth pastor, we also find that there is no reasonable probability that the assistance of an expert in the field of forensic psychology was necessary. Thus the motion to compel expert assistance lacked merit.

*2. Motion to suppress the unwarned recorded statements of the appellant to LCpl JM*

Article 31, UCMJ, states in pertinent part:

> (b) No person subject to this chapter may interrogate, or request an accused or a person suspected of an offense without first informing him of the nature of the accusation and advising him that he does not have to make any statement regarding the offense of which he is accused or suspected and that any statement made by him may be used as evidence against him in a trial by court-martial.
>
> . . . .
>
> (d) No statement obtained from any person in violation of this article, or through the use of coercion, unlawful influence, or unlawful inducement may be received in evidence against him in a trial by court-martial.

---

[15] When asked if the incident caused her to suffer any "post-traumatic stress type issues," JW stated that she did not know but that she was "more afraid of the police than anybody else." Record at 89.

[16] *Id.* at 110.

"Thus, Article 31(b), UCMJ, warnings are required when (1) a person subject to the UCMJ, (2) interrogates or requests any statement, (3) from an accused or person suspected of an offense, and (4) the statements regard the offense of which the person questioned is accused or suspected." *United States v. Jones*, 73 M.J. 357, 361 (C.A.A.F. 2014) (citation and footnotes omitted). Understanding that if these predicates were literally applied they would have "comprehensive and unintended reach into all aspects of military life and mission" *United States v. Cohen*, 63 M.J. 45, 49 (C.A.A.F. 2006), the Court of Appeals for the Armed Forces (CAAF) found that under Article 31(b)'s second requirement—interrogates or requests any statement—rights warnings are required if "the person conducting the questioning is participating in an official law enforcement or disciplinary investigation or inquiry." *United States v. Swift*, 53 M.J. 439, 446 (C.A.A.F. 2000).

However, cases involving undercover officials and informants, like the present case, involve unique considerations. As noted by the CAAF in *Jones*, "[b]ecause undercover officials and informants do not usually place the accused in a position where a reasonable person in the accused's position would feel compelled to reply to questions . . . logic dictates that Article 31(b), UCMJ, would not apply in those situations." *Jones*, 73 M.J. at 361 n.5. The *Jones* court, modifying its previous ruling in *United States v. Duga*, 10 M.J. 206 (C.M.A. 1981), adopted a two-prong test for determining whether statements by an accused to an undercover official or informant must be suppressed.

The appellant asserts that his counsel were ineffective because they did not move to suppress the appellant's unwarned recorded statements to LCpl JM when LCpl JM questioned him while participating in an official law enforcement or disciplinary investigation. Observing that LCpl JM was participating in an official law enforcement or disciplinary investigation as a confidential informant, we will analyze whether the appellant's unwarned recorded statements to LCpl JM would have been suppressed under the *Jones* two-prong test.

Under the first prong of the *Jones* test, we must initially determine whether LCpl JM was "participating in an official law enforcement or disciplinary investigation or inquiry, as opposed to having a personal motivation for the inquiry." *Id*. at 361 (internal quotation marks and citation omitted). We find that he was.

After LCpl JM reported to NCIS that the appellant admitted to raping JW, NCIS enlisted his assistance as a confidential informant. While acting as a confidential informant, under the direct observation of NCIS, and wearing a body wire to surreptitiously record their conversation, LCpl JM met with the appellant and questioned him about the offenses he was suspected of committing. Accordingly, LCpl JM was plainly participating in an official law enforcement investigation.

Having found that LCpl JM was participating in an official law enforcement investigation, under the second prong of the *Jones* test we must now determine whether a reasonable person in the appellant's position would have concluded that LCpl JM was acting in an official law enforcement or disciplinary capacity. *Jones*, 73 M.J. at 362. Given the totality of the circumstances, we conclude that a reasonable person in appellant's position would not have believed that LCpl JM was acting in an official law enforcement or disciplinary capacity.

At the time LCpl JM was acting as a confidential informant for NCIS, he and the appellant were good friends. They had previously been roommates for approximately four months, and, even after being moved into different rooms, were still neighbors in the barracks. Outside of work the two Marines spent extensive time together playing video games, going to the movies, eating out, and talking about their families and personal issues. When LCpl JM, acting as a confidential informant, met with the appellant, they met at a public location where he and the appellant had frequently gathered to play video games. Finally, when LCpl JM asked the appellant about their previous conversation during which the appellant admitted he raped JW, despite expressing concerns about potentially being under investigation and someone potentially listening to their conversation, the appellant willingly discussed what had happened with JW.

Having concluded that neither the motion to compel the production of expert assistance nor a motion to suppress the appellant's unwarned recorded statements to LCpl JM's possessed merit, we find no merit in the appellant's claims of ineffective assistance of counsel for failing to timely raise those motions.

*3. Military judge's denial of expert assistance*

The appellant also avers that the military judge abused his discretion by denying his motion to compel the production of expert assistance as untimely. Even assuming *arguendo* that it was error for the military judge to deny the appellant's motion as untimely, if the denial of the motion did not prejudice the appellant's substantial rights, then no relief is warranted.

Here, prejudice to the accused's substantial rights could only have resulted if there was a reasonable probability that the motion would have been successful on its merits. Having already determined that the motion lacked merit, we also find that this assignment of error is without merit.

**B. Factual sufficiency**

The appellant challenges the factual sufficiency of his conviction[17] arguing that this court cannot be convinced beyond a reasonable doubt of his guilt because JW's behavior was inconsistent with that of a rape victim and that when the appellant told LCpl JM that he had raped JW, his words were nothing more than "misogynistic . . . braggadocio."[18] We disagree, and find the conviction factually sufficient.

We review questions of factual sufficiency *de novo*. Art. 66(c), UCMJ; *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). The test for factual sufficiency is whether "after weighing the evidence in the record of trial and recognizing that we did not see or hear the witnesses as did the trial court, this court is convinced of the appellant's guilt beyond a reasonable doubt." *United States v. Rankin*, 63 M.J. 552, 557 (N-M. Ct. Crim. App. 2006) (citing *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987) and Art. 66(c), UCMJ), *aff'd on other grounds*, 64 M.J. 348 (C.A.A.F. 2007). In conducting this unique appellate function, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399. Proof beyond a reasonable doubt does not mean, however, that the evidence must be free from conflict. *United States v. Goode*, 54 M.J. 836, 841 (N-M. Ct. Crim. App. 2001).

The appellant stands convicted of raping JW in violation of Article 120(a), UCMJ. To sustain a conviction under this statute, we must be convinced beyond a reasonable doubt that: (1) the appellant committed a sexual act upon JW, to wit: penetration of her vulva with his penis; and (2) the appellant did so by using unlawful force, to wit: any act of force done without legal justification or excuse. MCM, Part IV, ¶ 45.b.(1)(a). "Force" means "the use of physical strength or violence as is sufficient to overcome, restrain, or injure a person."

---

[17] We note that the appellant does not challenge the legal sufficiency of his conviction. However, we are mindful that Article 66(c), UCMJ requires us "to conduct a *de novo* review of [both the] legal and factual sufficiency of the case." *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002) (citing *United States v. Cole*, 31 M.J. 270, 272 (C.M.A. 1990). "The test for legal sufficiency of the evidence is whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt." *United States v. Humphreys*, 57 M.J. 83, 94 (C.A.A.F. 2002) (citation and internal quotation marks omitted). We find the evidence legally sufficient.

[18] Appellant's Brief of 14 Sep 2017 at 15.

*Id.* at ¶ 45.a.(g)(5). "Unlawful force" is defined as "an act of force done without legal justification or excuse." *Id.* at ¶ 45.a.(g)(6).

Here, the evidence establishes that the appellant penetrated JW's vulva with his penis with the required degree of force to overcome and restrain JW and that the force was unlawful. JW's unrebutted testimony was that while penetrating her vulva with his penis from behind, the appellant held her down on the bed by pressing his forearm between her shoulder blades and forced her face into the mattress by pressing on the back of her neck with his hand. JW also testified that she told the appellant "no" and "stop" several times to which the appellant responded without stopping, "You know this isn't rape; right?"[19] Furthermore, JW's testimony describing her rape by the appellant was corroborated by the appellant's multiple admissions to LCpl JM.

The first time the appellant spoke to LCpl JM about the rape of JW was on 7 August 2016—prior to LCpl JM reporting the rape to NCIS and becoming a confidential informant for NCIS. After the appellant received a call from JW in LCpl JM's presence, the appellant told LCpl JM that JW had said that if he—the appellant—would not "get back with [her]" she would report him to the command for rape.[20] When asked by LCpl JM whether he had raped JW, the appellant responded, "[y]es, I did rape her."[21] In the same conversation the appellant described the rape to LCpl JM, "I hold [sic] her down on the bed and I raped her. It wasn't that hard. She only weighs 115 pounds, so it was pretty easy to hold her down."[22] And when LCpl JM asked the appellant if he was kidding, the appellant responded, "[n]o, I'm not joking. I did rape her."[23]

The second time the appellant discussed the rape of JW with LCpl JM was on 24 August 2016—after LCpl JM had become a confidential informant for NCIS. During this conversation the appellant confirmed that he had told LCpl JM that he had raped JW and that he had used force to do so.

Even after considering, as she testified to at trial, that JW engaged in consensual sexual intercourse with the appellant shortly after he raped her, and that after being raped she initially hoped to be able to continue a long term relationship with the appellant, we find her testimony that the appellant raped her by force credible and corroborated by the appellant's own words. Furthermore, considering the circumstance under which they were made and the relationship between the appellant and LCpl JM, we do not find the appellant's

---

[19] Record at 350.

[20] *Id.* at 484.

[21] *Id.* at 485.

[22] *Id.* at 485.

[23] *Id.* at 495.

statements to LCpl JM to be "misogynistic braggadocio" made in jest. Instead, we find them to be admissions. After weighing the evidence in the record of trial, and taking into account that we did not personally see or hear the witnesses, like the members, we too are firmly convinced of the appellant's guilt. *Rankin*, 63 M.J. at 557.

## C. Error in the SJAR and promulgating order

Although not raised as error by the parties, we note that the SJAR recommends and the promulgating order approves and orders executed a sentence which includes total forfeitures. Here the members only adjudged a sentence that included four years' of confinement, reduction to pay grade E-1, and a dishonorable discharge. This is error and it is plain and obvious. However, in order to be granted any relief there must be "some colorable showing of possible prejudice." *United States v. Kho*, 54 M.J. 63, 65 (C.A.A.F. 2000) (citation omitted).

Here, the appellant's adjudged sentence included confinement for four years and a dishonorable discharge. As such, by operation of law, 14 days after the date his sentence was adjudged, he automatically forfeited all pay and allowance. Arts. 58b(a)(1)-(2) and 57(a), UCMJ. Accordingly, the errors in the SJAR and promulgating order did not prejudice him as they did not deprive him of any pay or allowances he would have been entitled to, absent the errors. However, the appellant is entitled to court-martial records which accurately reflect his sentence. *United States v. Crumpley*, 49 M.J. 538, 539 (N-M. Ct. Crim. App. 1998). To ensure his adjudged sentence is accurately reflected, we order the necessary corrective action in our decretal paragraph.

## III. CONCLUSION

The findings and sentence are affirmed. The supplemental court-martial order shall reflect that the appellant was sentenced to confinement for four years, reduction to pay grade E-1, and a dishonorable discharge.

Senior Judge FULTON and Judge CRISFIELD concur.

FOR THE COURT

RODGER A. DREW, JR.
Clerk of Court

13